Sean P. Flanagan
Nevada Bar Number 5304
FLANAGAN, LTD.
7251 W. Lake Mead Blvd., Suite 300
Las Vegas, Nevada 89128
(702)562-4111
(702)562-4117 fax
Attorney for Plaintiff THOMAS W. FINN

**UNITED STATES DISTRICT COURT**

**STATE OF NEVADA**

| | |
|---|---|
| THOMAS W. FINN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF BOULDER CITY, a political subdivision of the STATE OF NEVADA; DAVE OLSEN, individually and in his capacity as City Attorney of Boulder City; ROGER TOBLER, individually and in his capacity as Mayor of Boulder City, CAM WALKER, ROD WOODBURY, PEGGY LEAVITT, and DUNCAN MCCOY, individually and in their capacities as City Councilmembers<br><br>Defendants | CASE NO.: |

Petitioner THOMAS FINN, by and through his attorney of record, Sean Flanagan, Esq. of Flanagan, Ltd. hereby files the following complaint and states as follows:

**JURISDICTION AND VENUE**

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)(1) and (3) ("Title VII"), Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, Section 7(b) of the ADEA of 1967, as amended, 29 U.S.C. § 626(b), which incorporates by reference 16(c) and 17 of the Fair Labor Standards Act of 1938 (the "FLSA"), as amended, 29 U.S.C. §§216(c) and 217.

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Nevada.

3. More than thirty days prior to the institution of this suit, THOMAS W. FINN filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission alleging violations of Title VII by the Defendants. All conditions precedent to the institution of this lawsuit have been fulfilled.

**PARTIES**

4. Plaintiff, THOMAS FINN, is expressly authorized to bring this action under Section 706(f)(1) and (3) of Title VII, 42 U.S.C. §2000e-5(f)(1) and (3), and by Section 7(b) of the ADEA, U.S.C. §626(b), as amended by Section of Reorganization Plan No. 1 of 1978, 92 Stat. 3781 and by Public Law 98-532 (1984), 98 Stat. 2705.

5. Defendant BOULDER CITY, as a political entity pursuant to the Nevada Revised Statutes, and at all times relevant hereto, employed Plaintiff FINN, is a person under *Monnell v. Department of Services,* U.S. 658 (1978).

6. Defendant DAVID OLSEN, is an attorney, and employed by the City of Boulder City. He is sued individually and in his official capacity as City Attorney of Defendant City of Boulder City. He is sued for punitive damages in his individual capacity. He is sued inter alia for filing false content and omissions. At all times relevant, OLSEN was acting in his capacity as the City Attorney for the City of BOULDER CITY and was acting under the color of law in his authority as City Attorney of the City of BOULDER CITY.

7. Defendant ROGER TOBLER, is an elected official, and Mayor of the City of Boulder City. He is sued individually and in his official capacity as City Mayor of Defendant City of Boulder City. He is sued for punitive damages in his individual capacity. He is sued inter alia for filing false content and omissions. At all times relevant, TOBLER was acting in his capacity as the Mayor for the City of BOULDER CITY and was acting under the color of law in his authority as Mayor of the City of BOULDER CITY.

8. Defendants CAM WALKER, PEGGY LEAVITT, DUNCAN MCCOY and ROD WOODBURY are elected officials of the City of Boulder City. They are sued individually and in their capacities as City Councilmembers of Defendant City of Boulder City. At all times relevant, WALKER, LEAVITT, MCCOY and WOODBURY were acting in their capacity as City Council Members of the City of BOULDER CITY and were acting under the color of law in their authority as council members of the City of BOULDER CITY.

9. That the true names and capacities, whether municipal, individual, corporate, associate or otherwise of the defendants herein designated inclusive, Plaintiff alleges that each named Defendant herein designated is negligently, willfully and deliberately indifferent or otherwise legally responsible for the events and happenings herein alleged. Plaintiff is informed and believes and therefore alleges that at all times relevant hereto each of the Defendants was the agent, affiliate, officer, director manager, principal, alter-ego, servant and/or employee of each of the other defendants and was at all times referenced herein, acting within the course and scope of such affiliation, agency, alter-ego relationship, and/or employment. Plaintiff is informed and believes and therefore alleges at all relevant times each defendant actively participated in or subsequently ratified, or adopted, or both, each and all of the acts or conduct alleged, with the full knowledge of all facts or circumstances, including, but not limited to, full knowledge of each and all of the violations of Plaintiff's rights and the damages to Plaintiff caused thereby.

## INTRODUCTION

10. From the day FINN was appointed as chief of police on March 22, 2006, until he was wrongfully terminated on April 15, 2013, he served Boulder City with integrity and excellence, and under his leadership the crime rate reduced to the point where Boulder City was named Nevada's safest city in 2012. During FINN's employment he became acutely aware that the predominantly Mormon City Council and Mayor made concessions for fellow church members, City Attorney OLSEN and others. FINN was asked by city officials to play favorites for their inner circle. FINN treated everyone the same regardless of their religious affiliation, and he refused to give in to any of the requests for preferential treatment.

11. FINN was faced with requests by members of the city council, Mayor ROGER TOBLER, City Attorney OLSEN, and influential members of their Church to break rules, treat members of the Church differently, change police reports, target individuals against whom they had a grudge, and turn a blind eye to unethical and illegal practices of City Attorney OLSEN and

certain members of the city council. FINN refused to follow the requests. FINN had the full support of his boss and direct supervisor pursuant to the Boulder City charter, City Manager Vicki Mayes. Despite the efforts of several influential members of Boulder City's Elite to convince Mayes to exert pressure on FINN to do as they demanded, Mayes refused to yield to Defendants and each of them and supported FINN.

12. Beginning with Mayes' announcement in May of 2012 that she would retire on December 12, 2012, key city council members, Mayor TOBLER and City Attorney OLSEN engaged in multiple acts of retaliation against FINN for his refusal to do as they requested. In particular, they attempted to prevent FINN from investigating and reporting on unethical behavior, as well as question City Attorney OLSEN's dismal prosecution of DUI offenses. FINN also confronted OLSEN regarding the allegations in a lawsuit OLSEN's son Brian filed against the City of Boulder City and a Boulder City Police Officer. FINN specifically told OLSEN that the law was clear on Brian Olsen's arrest and the officer was following proper protocol when he took Brian Olsen into custody at the request of a City of Henderson detective. FINN told OLSEN he would testify against Brian Olsen if and when the time came. From the date of Mayes' announcement until the date FINN was fired, The City of Boulder City, City Attorney OLSEN, Mayor TOBLER, Councilman CAM WALKER, Councilman DUNCAN MCCOY, City Manager DAVID FRASER and others conspired to violate FINN's civil rights, engaged in multiple acts of retaliation, committed multiple violations of the Family Medical Leave Act, and blatantly violated FINN's Peace Officer rights under NRS Chapter 289.

**FACTS**

13. THOMAS FINN was appointed Chief of the City of BOULDER CITY Police Department on March 22, 2006. City Manager Vicki Mayes conducted a nationwide search, reviewed 87 applications and selected and interviewed five finalists. FINN previously served as a police officer for 25 years in East Brunswick, New Jersey; his last seven years as Director of Public Safety and Deputy Chief. FINN retired from East Brunswick in 2005. Concurrent with serving as director, FINN spent 2002 through 2006 as a part-time adjunct professor of criminal justice at his alma mater, Rutgers University, where he earned his Bachelor's and Master's Degrees. An honorably-discharged veteran of the U.S. Navy, FINN earned his degrees at night under the G.I. Bill. (Exhibit 1)

14. FINN was Chief of Police of BOULDER CITY from March 22, 2006 until April 15, 2013. According to the FBI's Uniform Crime Reports from 2006 through 2010, crime in BOULDER CITY dropped significantly. In his 2011 State of the City speech, which was made on January 26, 2012, Mayor TOBLER stated, "While Boulder City's police officers do a superb job of protecting our residents, their success in making Boulder City one of the safest cities in Nevada would not be possible without their strong partnership with the community." TOBLER further stated, "Violent crimes, which includes murder, rape, robbery and aggravated assault, dropped by 26%. Property crimes, which include burglary, theft and motor vehicle theft, also dropped dramatically and are now 53% of what they were five years ago. Those incredible and consistent reductions in violent and property crimes can only be achieved by a partnership between the police department and our citizens." (Exhibit 2, Pages 8 & 9) The trend continued in 2012 when BOULDER CITY was declared the "Safest City in Nevada." (Exhibit 3)

15. FINN served BOULDER CITY with honor, integrity and excellence. He also served his law enforcement peers as President of the Nevada Sheriffs' and Chiefs' Association from 2009 through 2011. FINN was appointed by two consecutive Governors to serve as a commissioner on the Nevada Peace Officers' Standards & Training Commission. FINN had a spotless record, never receiving so much as a verbal reprimand in his 32-year career.

16. FINN'S position required him to reside within the city limits of BOULDER CITY. He drove a BOULDER CITY police vehicle, wore a BOULDER CITY police uniform, and received an allowance to pay for those uniforms. As part of his community outreach FINN wrote a weekly column for the local newspaper. On his own time, FINN held monthly public "MEET THE CHIEF" evening meetings, a practice continued until his termination. (Exhibit 4, Pages 1 & 2)

17. Brian Olsen, son of City Attorney DAVID OLSEN, was arrested by the Boulder City Police Department on March 10, 2010 at the request of the Henderson Police Department for allegedly stealing intimate photos off a female classmate's cell phone and emailing them to himself. (Exhibit 5)

18. In the spring of 2012, OLSEN asked Chief FINN his opinion of the arrest. FINN told OLSEN that in his opinion there was sufficient probable cause for the arrest, and he stated to OLSEN that the officer followed established protocol in assisting another law enforcement agency by taking the suspect into custody. (Exhibit 6)

19. On March 1, 2012, Brian Olsen filed suit again BOULDER CITY, one of its officers, and the Henderson Police Department and one of its officers. Despite the fact that Brian Olsen resides with his father, the lawsuit was never disclosed to the public. (Exhibits 6 & 7)

20. On February 23, 2012, Mayor TOBLER called FINN expressing his dissatisfaction with the police department's handling of a traffic stop in an exclusive development where TOBLER, Councilman WALKER, Boulder City Municipal Court Judge Victor Miller, and many other locally prominent Mormons own homes. TOBLER was extremely angry that FINN would not agree with him that the police response was excessive. Before abruptly hanging up TOBLER stated angrily, "There is no need for that kind of police response in ***that*** part of the city. We will never agree on this Chief!" (Emphasis added)

21. In May of 2012, City Manager Vicki Mayes announced that she would retire on December 12, 2012.

22. On May 14, 2012, Boulder City attorney Stephen Stubbs emailed FINN to inform him that Stubbs represented the "Mongols Motorcycle Club" and that the Mongols would be holding their annual national meeting in Boulder City on the weekend of June 22-24. Stubbs grew up in Boulder City and is a member of the LDS Church. FINN and Stubbs agreed to meet on May 24th at the site of the event, which was the Boulder Inn and Suites.

23. During the weeks leading up to the event, FINN was contacted and told that credible intelligence was received regarding possible violence. FINN was offered and accepted the assistance of many local, state and federal law enforcement agencies for the event, and the Las Vegas Metropolitan Police Department coordinated and led the weekend task force.

24. On June 11, 2012, FINN disseminated an email to his officers instructing them to remove any emails related to the Mongols event from their computers. FINN had observed officers leaving their desktop computers on with sensitive and confidential planning documents visible to anyone passing by. FINN knew he could legally issue the order since there was authority to do so in Nevada case law (*Donrey*), and FINN had previously conferred with City Attorney OLSEN who stated to FINN that under *Donrey* the information could be deleted from the desktops. OLSEN was aware of the backups conducted by the city's IT Department, and FINN assured him that he retained hard copies of all the documents in his office. (Exhibits 6 & 8)

25. On the Friday night of the event weekend, FINN received a call from Councilman WALKER, who asked to go on a ride-along in the area where the Mongols were holding their event. FINN picked up WALKER and rode with him for approximately one hour and discussed the event. WALKER told FINN that he was invited by Stubbs to meet the Mongols during their party that Saturday night. FINN cautioned WALKER not to go since the Mongols are considered by law enforcement to be a violent criminal organization. WALKER said he was going because Stubbs told him it would prove to him that the Mongols were "nice guys." (Exhibit 6)

26. On Saturday of the event weekend, Stubbs repeatedly called FINN and complained that LVMPD officers were "harassing his clients." FINN advised Stubbs to take his complaints to LVMPD Sheriff Doug Gillespie. At 2:58 p.m. on Saturday WALKER sent a text to FINN stating, "Still planning on going over at 5 and I would appreciate you calling Stubbs sometime in the next hour or so just to say hi." FINN texted WALKER back stating, "I have nothing to say to Stubbs so there's no need to call him. I'm going in at 6 and will be there all night. I'll let you know if anything happens." (Exhibits 6 & 9)

27. Former City Manager Vicki Mayes told FINN after her retirement in December of 2012 that shortly after he and WALKER exchanged the emails WALKER came to see her twice in her office and WALKER was furious over FINN's refusal to call Stubbs, claiming FINN's text was disrespectful and WALKER wanted him disciplined. Mayes informed WALKER that she could not discipline FINN for failing to follow WALKER's order because under the City Charter WALKER could not order FINN to do anything. Mayes told FINN that WALKER was visibly angry with her response. On March 18, 2013 FINN filed a complaint with the Public Integrity Unit of the Attorney General's Office. The complaint was subsequently forwarded to Clark County District Attorney Steve Wolfson on April 5, 2013. On April 15, 2013, the day FINN was fired, he received a response from Wolfson stating the WALKER complaint should be investigated by a law enforcement agency. (Exhibit 10)

28. In August of 2012, FINN requested copies of the last two years of DUI reports from the Police Department's Records Bureau. FINN had been alerted to possible problems with DUI prosecutions the previous year and decided to evaluate DUI enforcement and prosecutions after he learned that charges were routinely being downgraded and dismissed.

29. On Sunday October 14, 2012, Councilman WALKER sent a text message to FINN asking for the details of a vehicle/bicycle crash the night before. FINN obtained the details from the investigating officer and called WALKER back. WALKER told FINN the driver, local resident Kirk Harrison, "might have been drinking and under the influence of alcohol." FINN told WALKER that the investigating officer conducted field sobriety tests on Harrison and there were no signs of impairment, nor was there even an odor of an alcoholic beverage on Harrison's breath. WALKER replied, "That's not what I was told at church." WALKER then asked FINN, "Are you sure he wasn't drinking or under the influence?" When FINN stated emphatically that Harrison was thoroughly tested at the scene of the crash and he did not exhibit any signs of impairment, WALKER stated, "Well, I heard differently. Please take another look at it." FINN told WALKER that what he heard was wrong, and in fact Harrison was not at fault for the crash, the bicyclist was. (Exhibit 6)

30. FINN later learned in a phone conversation with Mr. Harrison that WALKER and Harrison knew each other and their families were good friends at one time. According to Mr. Harrison, WALKER attempted to convince Mrs. Harrison to loan him money for a business venture while the Harrisons were going through a divorce. Harrison stated to FINN that he had to tell WALKER to "back off" and stop trying to borrow money from his wife. (Exhibit 6)

31. In early October of 2012, City Attorney OLSEN told City Manager Vicki Mayes that he, "Hasn't been able to reach the chief all day." When Mayes called FINN a few minutes later, she spoke with FINN and learned he was in his office all day. Mayes called OLSEN back and told him he was wrong. (Exhibit 6)

32. In mid-October of 2012, City Manager Vicki Mayes alerted FINN that Mayor TOBLER and Councilman ROD WOODBURY came to her office and said they, "Heard from some in the PD that the chief is never in his office." Mayes explained to them that, "The chief always gets his work done and I never have a problem reaching him." Mayes told FINN that OLSEN was the one spreading the rumor. (Exhibit 6)

33. On October 9, 2012, LDS member and Councilwoman PEGGY LEAVITT sent FINN an email stating there were multiple noise complaints regarding the Brew Pub Restaurant. In keeping with the chain of command, FINN apprised City Manager Mayes of the email and provided her with a detailed response proving that his officers had done their job and City Attorney OLSEN had not. FINN produced all the evidence showing the citations that were

issued to the Brew Pub were dismissed by OLSEN, "In the interest of justice." OLSEN has a personal friendship with Brew Pub owner Todd Cook, and both OLSEN and Cook are members of the Boulder City Sunrise Rotary Club. (Ex. 11)

34. In early October of 2012, Sergeant John Chase met with Attorney Stephen Stubbs to discuss the insurance business Chase operates in Boulder City, separate and apart from his job as a police officer. Chase informed Stubbs about FINN's email of June 11, 2012 ordering that all Mongols-related emails be removed from police department computers. The email then magically appeared under Stubbs' office door the next morning. Chase, who previously was demoted from deputy chief for performance inadequacies, was a disgruntled subordinate who repeatedly undermined FINN and falsely accused FINN of wrongdoing, none of which he could ever substantiate. Chase received a unanimous vote of no confidence from the rank and file police officers.

35. On October 9, 2012, Attorney Stephen Stubbs amended his Civil Rights lawsuit against LVMPD and North Las Vegas, and added Boulder City Chief of Police THOMAS FINN and Detective Scott Pastore, using the "email deletion order" as his basis for the amendment. FINN and all city employees were alerted on October 16, 2012 by City Clerk Lorene Krumm to provide her office with all the emails related to the Mongols. Stubbs requested, "All Mongols-related emails" in a public records request. All the requested emails were provided by FINN and other members of the BCPD and were turned over to Stubbs by City Clerk Krumm.

36. On October 18, 2012, OLSEN saw Councilman WALKER at an LDS Church function where they discussed Stubbs' allegations against FINN. During that conversation WALKER told OLSEN that based upon Stubbs' allegations he wanted FINN put on administrative leave. (Ex. 12, pgs. 1-4) According to the City Charter, Section 11, subsection 1:

> Neither the Council nor any of its members shall direct or request the appointment of any person to, or his or her removal from, office by the City Manager or by any of his or her subordinates, or in any manner take part in the appointment or removal of officers and employees in the administrative service solely through the City Manager, and neither the Council nor any member thereof shall give orders to any subordinates, or in any manner take part in the appointment or removal of officers and employees in the administrative service solely through the City Manager, and neither the Council nor any member thereof shall give orders to any subordinates of the City Manager, either publicly or privately.

(1959 Charter)

37. On October 18, 2012, FINN suffered dizzy spells and was seeing spots in the periphery of his vision. He immediately went to see his personal physician, Dr. Warren Smith. FINN'S blood pressure was extremely elevated, which Smith labeled as being "borderline dangerous." Smith prescribed medication and home rest. (Exhibit 6)

38. On October 22, 2012, at the weekly staff meeting with all the department heads, a spirited discussion focused on what the city's policies and state laws were regarding the preservation of emails. There was no consensus on which emails should be retained and which could be deleted. FINN told those present that it didn't matter because all emails were saved in data backups and in the Lotus Notes "All Documents" folders. (Exhibit 6)

39. Immediately following the October 22, 2012 city staff meeting, City Attorney OLSEN asked FINN if he could speak with him privately. OLSEN told FINN that his wife heard FINN was doing an investigation into DUI conviction rates. FINN explained to OLSEN that he was aware of the poor conviction rates and he wanted to know if his officers were writing good reports. The discussion turned to Stephen Stubbs and his unrelenting false allegations about FINN. The discussion was interrupted by OLSEN's cell phone ringing, and OLSEN then stated, "Speak of the devil, it's Stephen Stubbs. Do you want to listen?" Surprised by the offer, FINN stated, "Sure." Stubbs told OLSEN he was having difficulty finding someone to file a criminal complaint against FINN for deleting public records. Stubbs then went into detail about his conversation with WALKER, who told him that OLSEN was investigating FINN. FINN became very concerned as he observed firsthand how comfortable OLSEN was with Stubbs, who was suing the city in federal court. Stubbs referred to his conversation with OLSEN as "brainstorming" on how to get FINN charged. (Exhibits 6 & 13)

40. FINN had his personal iPhone in his hands during the meeting with OLSEN, and as soon as the conversation with Stubbs ended FINN activated the "voice memo" feature on his iPhone and recorded his conversation with OLSEN. (Exhibits 6 & 12)

41. On October 24, 2012, City Manager Mayes told FINN that WALKER wanted to put FINN on administrative leave, and that the council had mentioned giving FINN a "vote of no confidence." MAYES told WALKER she would not put FINN on paid administrative leave and the vote of no confidence by the city council was inappropriate based upon Stubbs' allegations.

Mayes told FINN that this was a personal vendetta against him led by OLSEN, WALKER and TOBLER because WALKER'S actions were a direct violation of the City Charter. (Exhibit 6)

42. On October 25, 2012, OLSEN sent an email to City Manager Mayes and the city council asking for their guidance on the issues STUBBS brought forward about FINN. OLSEN received a complaint from STUBBS and a request for investigation into whether FINN "committed a felony" by ordering his officers to delete Mongols-related emails. OLSEN's lack of honesty and integrity was underscored when, just seventy-two hours prior, during his taped conversation with FINN, OLSEN stated the following when speaking about the allegations on FINN by Stubbs, "You shouldn't have to go through this stuff just because some chappy-lipped little mouth breather thinks he can make a name for himself." (Exhibit 12, page 13, lines 24-25, page 14, line 1) Further demonstrating his low standards, in the taped conversation of October 22, 2012, while commenting about City Manager Mayes' high standards and his lack of same, OLSEN stated, "And numerous times I haven't measured up." (Exhibit 12, page 10, lines 14-15) "I guess I've given up my high standards." (Exhibit 12, page 8, lines 13-14)

43. On October 31, 2012, FINN met with Attorney Sean Flanagan regarding what FINN perceived as interference with his right to do his job. FINN wanted to offer the city a chance to buy out his contract if they were going to continue the public attack on him and not support him in his work.

44. On November 1, 2012, a meeting was held in Vicki Mayes' office with FINN, Attorney Flanagan, City Manager Mayes, OLSEN and Personnel Administrator Bryce Boldt. FINN's settlement offer was presented to Mayes. Flanagan explained why the settlement document was prepared and he provided some of the evidence proving that FINN was being targeted for removal. A copy of the transcript of the taped conversation between FINN and OLSEN was disclosed for the first time and provided to city officials. Flanagan sent Mayes a follow-up letter on November 7, 2012, outlining the discussion regarding the concentrated efforts to remove FINN from his position.

45. On November 13, 2012, FINN attended the City Council meeting. Also attending was Stubbs, Steve Sanson of Veterans in Politics International, and several full-patched motorcycle club members. Stubbs, his father and Sanson were permitted to speak for five minutes during the public portion and they launched a vicious attack on FINN regarding the "deletion of emails." Mayor TOBLER failed to stop them despite the rules prohibiting personal

attacks on the council or city staff members. In the past TOBLER has stopped residents when they personally attacked any members of the council.

46. During the month of November the city council offered fellow LDS member DAVID FRASER the position of City Manager, even though FRASER's application was late and he never submitted his answers to the candidate questionnaire. FRASER was the least experienced of all the candidates. The other candidates had to comply with the rules, and FRASER did not. FRASER accepted the job.

47. Prior to going out of town in early November, Mayes gave orders to her staff to not prepare the staff report regarding the request for an investigation on FINN. When Mayes returned she was stunned to see the document on the agenda. Mayes told FINN it was a clear example of OLSEN's retaliation toward FINN because it was OLSEN who wrote the staff report and then added it to the agenda against her wishes. (Exhibits 6 & 14)

48. On November 21, 2012, FINN filed a lawsuit against WALKER, OLSEN, TOBLER, Stubbs and others in Clark County District Court, alleging that they "acted in concert to inflict damage upon FINN's reputation….and intentionally interfered with FINN's contractual relationship with Boulder City." No one was ever served with this suit.

49. On November 21, 2012, OLSEN presented his staff report to the city council, asking them to consider requesting an independent investigation of wrongdoing by FINN for deleting emails. In the document OLSEN purposely did not state that all the emails had been retained and turned over to Stubbs, that a copy of all emails was retained on a city server even if they had been deleted from an employee's desktop computer, that copies of the emails were retained in data backups, that they were retained in everyone's emails in the "All Documents" folder, and that FINN had hard copies of all the emails. OLSEN also purposely failed to mention the confidential law enforcement exceptions to public records, with which OLSEN was intimately familiar, *Donrey of Nevada v. Bradshaw*, 106 Nev. 630, 798 P.2d 144.

50. On November 21, 2012, The Las Vegas Review Journal ran a story on FINN'S lawsuit against Stubbs, WALKER, TOBLER, OLSEN and others. OLSEN was quoted as saying he had not yet seen the lawsuit but said, "Finn created the conspiracy theory out of virtually nothing. I do believe Stephen Stubbs has very strong feelings about the Chief." OLSEN said, "But all those other names you gave me I have never heard them say, hey the Chief needs to go."

That was in direct conflict with OLSEN's recorded conversation with FINN that WALKER wanted FINN placed on administrative leave. (Exhibit 15, page 2, lines 10-11)

51. Mayes told FINN after her retirement in December of 2012 that several days after he filed his lawsuit in late November of 2012, Mayor TOBLER came to see her in her office and stated, "The chief is suing us so we cannot continue to work with him. He needs to be fired." Mayes informed TOBLER that firing FINN would be clear retaliation. Mayes told FINN that TOBLER was "livid with him for filing the lawsuit and wanted Mayes to fire FINN." TOBLER's request was a violation of the Boulder City Charter, and on March 19, 2013 FINN filed a complaint with the Public Integrity Unit of the Attorney General's Office. The complaint was subsequently forwarded to Clark County District Attorney Steve Wolfson on April 5, 2013. On April 15, 2013, the day FINN was fired, he received a response from Wolfson stating that the TOBLER matter should be investigated by a law enforcement agency. (Exhibit 16)

52. On November 27, 2012, OLSEN recommended to the City Council that although FINN, "…probably didn't destroy public records," the matter should be referred out for an investigation. OLSEN stated he hired an outside legal counsel who, "Expressed concern an attempt was made to destroy public records." In his "outside counsel" opinion letter dated November 21, 2012, obtained by a public records request, Attorney Jeffrey Pitegoff expressed no opinion on whether a law was broken. Pitegoff simply stated that if the city wanted the chief of police investigated it was acceptable to have him investigated by another agency. When asked numerous times by Vicki Mayes, Attorney General's Office Investigator Anthony Kotlarz, and by FINN in a public records request, for the identity of the outside counsel and the opinion the attorney provided that, "expressed concern an attempt was made to destroy public records," OLSEN refused to provide the document and eventually admitted he "received no such opinion." (Exhibits 6 & 17)

53. The City Council convened an executive session on November 27, 2012 and OLSEN informed the council of FINN's settlement offer. It was decided that the city would not engage in settlement negotiations with FINN. Further evidence of WALKER's retaliatory behavior was evidenced in the closed-door executive session of the City Council on November 27th, 2012. Although FINN was not present for the meeting he was made aware of the angry and accusatory statements made that evening by WALKER in a conversation FINN had with Director of Community Development Brok Armantrout on Monday, January 14, 2013.

Armantrout approached FINN after a city staff meeting and described WALKER's comments about FINN as being "vicious." Armantrout further stated to FINN, "You would be proud of Vicki for the way she stood up for you against Cam (WALKER) and supported you." (Exhibit 6)

54. In a news story on November 28, 2012, OLSEN stated "He (FINN) probably did not commit the offense, but he did commit an attempt, and in Nevada for example, the offense of destroying these records is subject to penalties as a Category C felony." At the time OLSEN was still FINN'S attorney under the Boulder City Charter. (Exhibit 18)

55. On November 29, 2012, Stubbs filed a police report claiming FINN illegally taped his phone call to OLSEN without his knowledge. (Exhibit 19) City Manager Mayes was never told about the complaint, and according to policy she should have been notified immediately. The only person notified of the complaint was OLSEN. OLSEN knew there was no probable cause to move forward with an investigation, yet he instructed the officers to do just that. OLSEN was not allowed to order officers to do anything, however, he did it anyway in violation of the Boulder City Charter.

56. During a city council meeting OLSEN stated to the council that an audit of the Police Department should be conducted based on "rumors." Councilman WOODBURY commented to OLSEN that nothing should be done based on rumors, but his advice was not taken into consideration and an audit was authorized. (Exhibit 20)

57. In late November of 2012, outgoing City Manager Mayes informed FINN that TOBLER and OLSEN cut her out of anything that had to do with him, stating to FINN, "They are meeting without me." Mayes informed FINN that she told TOBLER, "What you are doing is illegal and I will be Tom's star witness when this matter goes to court." Mayes told FINN the attacks on him were based on religion, saying, "It's the Mormon thing," and that OLSEN and WALKER were doing this as pure retaliation against FINN. Mayes expressed sorrow over what was happening to FINN, but she was powerless to stop it. Mayes told FINN that WALKER and OLSEN were spearheading everything against him, and TOBLER had direct knowledge and approved of their actions. (Exhibit 6)

58. On November 27, 2012, FINN's attorney Sean Flanagan received an anonymous fax. The fax contained many disturbing allegations about Stubbs. Human Resources Administrator Boldt also received the fax in his office and he was instructed by City Manager Mayes to give the fax to OLSEN. Instead of investigating the accuracy and authenticity of the

fax, OLSEN did nothing. Acting City Manager Scott Hansen told FINN he was contacted on December 17, 2012 by City Manager-select FRASER and told that FINN was using an on-duty detective to conduct an investigation that would benefit FINN'S lawsuit. FINN assured Hansen that the only investigation he was conducting was whether the "anonymous fax" was authentic, and if it was it would most certainly jeopardize the lives of Stubbs and his family. (Exhibit 21)

59. In December of 2012, a city resident confided in FINN that WALKER made it very clear to him that his proposed multi-million dollar project in Boulder City, "Was not going to be approved unless McCarthy Construction gets the contract." WALKER was employed by McCarthy Construction at the time. FINN decided to meet with a special agent from the FBI's Public Corruption Unit in Las Vegas and shared details with him of WALKER's unethical and potentially illegal behavior.

60. On November 15, 2012, FINN was told by Dispatcher Ruby Perkins that she and other employees were being interviewed by Human Resources Administrator Boldt regarding an investigation of FINN for allegedly running a license plate two years prior, which was previously investigated and determined to be unfounded. FINN contacted Boldt on December 30, 2012 via email stating, "Please consider this email as formal notice to you and the city that I will most certainly assert my NRS Chapter 289 rights as a peace officer if the city conducts any investigations into my performance." (Exhibit 22) FINN was never notified of any investigations by the city, yet the investigations continued behind the scenes at the direction of OLSEN.

61. On January 7, 2013, following the city staff meeting, Boldt told FINN in Boldt's office, "I still need to get that license plate investigation on you off my desk." FINN asked Boldt if he had spoken with the city's labor attorney, Mark Ricciardi, for an opinion on how to investigate FINN. Boldt said Ricciardi hadn't yet called him back. FINN then told Boldt once again that he was told by City Manager Mayes two or three months ago that she looked into the allegation that was then two years old and concluded that there was nothing to it. Boldt then stated to FINN that he was told to speak with the "witnesses" and decide if it should be a formal investigation. FINN reiterated to Boldt that he was covered under NRS Chapter 289 and would not waive his rights. Boldt told FINN that he didn't blame him but he was confused on how to proceed because, "One attorney told me I could do the investigation and another attorney told me only a peace officer could investigate." FINN told Boldt, "Either way Bryce, you and I both

know this is nothing more than a retaliatory witch hunt orchestrated by OLSEN, and you're caught in the middle." Boldt smiled but did not respond. (Exhibit 6)

62. On January 9, 2013, despite FINN asserting his NRS Chapter 289 rights, Boldt sent an email to Police Officer David Olson (unrelated to City Attorney OLSEN), stating, "I am conducting an administrative investigation into an allegation regarding the Chief of Police and it has been brought to my attention that you may have information regarding the allegation. I'd like you to contact me tomorrow when you are available to come to my office." (Exhibit 23)

63. DAVID FRASER started his new position as City Manager on January 5, 2013. FRASER met with FINN for ninety minutes on January 14, 2013 and told FINN he wasn't all that familiar with what was happening between FINN and the city, but he assured FINN that he was not being targeted and would not be fired. (Exhibit 6)

64. On January 16, 2013, FINN scheduled an emergency appointment with his doctor for what he believed was stress-related high blood pressure. FINN'S blood pressure was dangerously elevated and his doctor immediately placed FINN on blood pressure medication and thirty days of FMLA leave. (Exhibit 6)

65. On January 17, 2013, OLSEN was quoted in the Boulder City Review, stating, "The Bushmaster AR-15 style rifle was missing during a department inventory shortly after the City Council vote to have the police department audited." City Attorney Olsen said. "Police Chief Thomas Finn heard the council was interested in going ahead with an audit, and that's when he contacted people and asked "Let's do an inventory." OLSEN said. "Olsen said the inventory also revealed that two pairs of night vision goggles were missing." FINN ordered Albowicz to conduct the inventory as a routine matter following the reassignment of a range master, and it was well before the audit was announced. OLSEN's lie about missing night vision goggles was addressed by Sergeant John Glenn to Officer Mike Daniel in an email exchange dated February 4th and 5th of 2013. Glenn stated he saw the newspaper article about the missing goggles and told Daniel, "I do not know what they were talking about." (Exhibit 24)

66. On January 21, 2013, City Manager FRASER called FINN on his cell phone, completely disregarding FMLA regulations. FRASER called to admonish FINN for allegedly speaking to the press regarding the murder/suicide of a Boulder City family. FRASER ordered FINN to, "Stop talking to the press" because he read an online quote from FINN about the incident. FINN told FRASER he received a call from a reporter and he told him he was out on

medical leave and to call dispatch for any information. FRASER reminded FINN that he was on FMLA leave and could not speak with the press or anyone else regarding city or police department business. Despite FINN telling FRASER that he did not make any statements to the media, FRASER admonished FINN and ordered him to cease and desist from talking to the media. Human Resources Administrator Boldt was then ordered by FRASER to conduct an investigation into FINN speaking with the press while on medical leave, and the investigation showed that the suspect's next-door neighbor had the last name of Finn and the reporter assumed it was Chief FINN he was speaking with. FRASER never contacted FINN to admit his mistake or to apologize for his false accusations, nor was FINN notified, in accordance with his NRS Chapter 289 rights, that this additional investigation was taking place. (Exhibit 6)

67. On February 9, 2013, Councilman MCCOY was interviewed by Steve Sanson on Sanson's Veterans in Politics International radio show. TOBLER, Councilwoman LEAVITT and Councilman WOODBURY received support from Veterans In Politics International and in return they reciprocated financially. Veterans In Politics International is the media outlet TOBLER, WALKER and OLSEN used to attack those they want discredited. TOBLER and OLSEN did the same thing to former Mayoral candidate Linda Strickland when at the direction of TOBLER, OLSEN surreptitiously prepared "bullet points" for Sanson's interview of Strickland. MCCOY stated on the air that he believed FINN would be fired and a new chief of police would be hired. MCCOY also stated that "We had a -- a departing city manager who wouldn't address the problem (FINN). We have a new one coming in. You'd have to ask him how he's going to handle it." (Exhibit 25)

68. Upon completing his investigation of wrongdoing by FINN, Attorney General's Office Investigator Anthony Kotlarz determined FINN did nothing wrong. He further found that in the initial "Request for Investigation" from OLSEN to the Attorney General's Office that OLSEN submitted the *Donrey* case as proof of FINN's alleged wrongdoing, and OLSEN purposely omitted the exception on the last page of that decision that clearly exonerated FINN. OLSEN used the information to support his contention that, "in the absence of a statutory provision that explicitly declares a record to be confidential, any limitations must be disclosed upon a broad balancing of the interests involved." OLSEN limited his presentation of the case without identifying the "law enforcement exception" contained within the same legal opinion. OLSEN also "forgot" to state that he told FINN that he could order the emails removed under *Donrey.* (Exhibit 26)

69. On March 8, 2013, FINN filed a formal complaint with the U.S. Equal Employment Opportunity Commission for religious and age discrimination. (Exhibit 27) After FINN was fired on April 15, 2013, the EEOC advised FINN that they were amending his complaint to include retaliation based on overwhelming evidence provided to them by FINN.

70. On March 12, 2013, City Manager FRASER appointed Councilwoman LEAVITT's nephew, William Conger, as Acting Chief of Police. FINN was scheduled to return from his two-month FMLA leave on March 18th, and the police department operated without an "acting chief of police" during FINN's two-month leave. No interviews were conducted, and a background investigation was not completed on Conger before he was hired, a violation of 289.110 of the Nevada Administrative Code. When the background investigation requirement was raised by Human Resources Administrator Boldt, FRASER stated, "Don't worry, I'll vouch for him. Just get it done." FRASER then lied to the Boulder City Review when he stated, "We had a list of five candidates for the position." In an open records request to FRASER asking for the list of the other four candidates, FRASER stated that he did not have a list of the candidates. On March 19, 2013, FINN filed a complaint against City Manager FRASER with the Nevada Attorney General's Office Public Integrity Unit for the Nevada State Law and Boulder City Charter violations. The complaint was subsequently forwarded to Clark County District Attorney Steve Wolfson on April 5, 2013. On April 15, 2013, the day FINN was fired, he received a response from Wolfson stating that the FRASER matter should be investigated by a law enforcement agency. (Exhibit 28)

71. The hiring of Councilwoman LEAVITT's nephew as Acting Chief of Police was a direct violation of the portion of the Boulder City Charter pertaining to the hiring of relatives. Conger had not served as a Nevada peace officer since 2005, and his peace officer certification expired in 2010. After FINN was fired the city created a new title and appointed Conger to the full-time position of "Chief of Police Administration," a civilian, non-sworn position. The city also arranged the salary payments to Conger as a "contract employee" through a California staffing company, a company that is not qualified to do business in the State of Nevada. The "contract employee" arrangement was made so Conger could continue to collect his Nevada pension. Conger's new title of Chief of Police Administration does not exist in the Boulder City Charter, where the head of the police department holds the titles of Chief of Police and Director of the Police Department. A September 12, 2013 Boulder City Review article stated, "Compared with hiring a chief, the arrangement saves the city about $30,000 because it does not have to pay

Conger's benefits." In that same article City Manager FRASER stated, "I'm not doing this to save $30,000, but it doesn't hurt." (Exhibit 29)

72. On March 18, 2013 and April 10, 2013, FINN filed complaints against Councilman WALKER with the Nevada Attorney General's Office Public Integrity Unit and the Nevada Commission on Ethics for voting on a resolution involving the Korea Midland Power Company (KOMIPO) project. WALKER was employed at the time as the Director of Business Development for McCarthy Construction, one of the companies submitting proposals for the project. Section 116 of the Boulder City Charter states, "No elective or appointive officer shall take any official action on any contract or other matter in which he has any financial interest." Prior to FINN filing his complaints, City Manager Mayes and several other department heads warned WALKER about the impropriety of taking KOMIPO executives golfing and to lunch, something that WALKER shamelessly did often. WALKER also openly bragged that, "McCarthy Construction is going to build one of the solar energy plants." The Public Integrity Unit complaint was subsequently forwarded to Clark County District Attorney Steve Wolfson on April 5, 2013. On April 15, 2013, the day FINN was fired, he received a response from Wolfson stating that the WALKER matter should be investigated by a law enforcement agency. (Exhibit 30)

73. On April 11, 2013, City Attorney OLSEN was interviewed in city hall by Channel 8 I-Team Chief Investigative Reporter George Knapp. OLSEN invited the city's department heads to attend the interview and had it taped "so it could be broadcast on BCTV." In violation of federal FMLA and federal Privacy Act laws, and in violation of the Rules of Professional Conduct for Nevada Attorneys for failing to appropriately represent his client (FINN), OLSEN stated, "He's currently a full-time employee (incomprehensible) who's on FMLA leave because a doctor stated that the job stresses were more than he could handle at this time and needed to take a leave. Nobody's -- nobody's talking about firing the Chief except the Chief. Nobody is -- has taken any kind of disciplinary action against the Chief for, for any reason at all. So I'm curious why are – what is there for me to recuse myself from if there is no conflict between the chief and the city council?" (Exhibit 31, page 9, Lines 18-25) Human Resources Administrator Boldt later told FINN that he "cringed" when he heard OLSEN's disclosure of FINN's personal medical information. When FINN learned that the city made audiotapes of the entire interview available for sale through the city clerk's office FINN put Boldt on notice that the city must cease and desist from continuing to disseminate his medical information. FINN was contacted several weeks later by a neighbor who

told him he had just purchased an audiotape cassette of the interview from the city clerk's office for $5.00. FINN again notified the city of their continued violations of his Privacy Act rights. (Exhibit 32)

74. FINN took FMLA leave from January 16, 2013 through April 14, 2013. City Manager FRASER immediately fired FINN upon his return to work from FMLA leave on April 15, 2013. FINN was asked to resign and when he refused to do so he was terminated. He was not given a reason for his termination. (Exhibit 33)

75. On April 18, 2013, Councilman MCCOY was quoted in the Boulder City Review as saying, "The city manager does not need a reason to terminate the Chief of Police. If he (FRASER) doesn't like the smell of the chief's cologne, or the chief doesn't share his vision, he can be terminated." (Exhibit 34)

76. Eight days after FINN was fired OLSEN signed a sworn affidavit as his son Brian's expert witness in Brian's lawsuit against Boulder City. (Exhibit 35)

77. On February 12, 2014, the Nevada Commission on Ethics released its findings on the Complaint FINN filed against WALKER, announcing that WALKER was in the process of negotiating a plea deal on the violations. On March 20, 2014 WALKER and the Commission entered into a Stipulated Agreement. WALKER admitted to the violations, however, they were not deemed willful since WALKER relied on the advice of OLSEN. (Exhibit 36)

78. On February 24, 2014, FINN filed concurrent complaints with the Nevada Commission on Ethics and the Nevada State Bar after learning that OLSEN was serving as his son's expert witness in the son's lawsuit against the City of Boulder City, OLSEN's employer. (Exhibit 37)

79. On February 26, 2014, eleven months after FINN filed his EEOC complaint, and ten months after the city's response was due, OLSEN filed the city's answer. In his response OLSEN denied any religious, age or retaliatory discrimination against FINN and stated, "This case is based upon the delusional ideas and paranoia of Chief Tom Finn." OLSEN further stated that FINN's tenure as Chief was "plagued with morale problems." OLSEN implied that FINN was fired because of FINN's lawsuit, stating that by filing his lawsuit, "FINN has seriously damaged his professional relationships with the City's department heads, including the City Manager." OLSEN further stated, "FINN created such a hostile environment between himself and other department heads…the City Manager determined that FINN was no longer effective in

his position as Chief of Police." OLSEN 's rumor-based response, which contained no substantiation, was clear defamation and contradicts what OLSEN told FINN during their taped face-to-face discussion on October 22, 2012. (Exhibit 38)

80. On February 27, 2014, Brian Olsen lost his federal lawsuit against Boulder City and Henderson on a Motion For Summary Judgment. (Exhibit 39)

81. On March 18, 2014, OLSEN responded to the Nevada State Bar Complaint FINN filed against him for serving as his son's expert witness in his lawsuit. In the response OLSEN categorically denies ever representing his son. In OLSEN'S answer to the Bar Complaint he claimed he was NOT the expert witness for his son. That matter is pending a full hearing before the State Bar's Disciplinary Board. (Exhibit 40)

82. In letters sent to Mayor TOBLER on June 30th and July 8, 2014, FINN requested a "conflict referral" to the Nevada Attorney General's Office to investigate a) the "catastrophic server failure and loss of public records, including City Manager FRASER's calendars," and, c) OLSEN's misconduct for lying by omission to the Attorney General when he was obligated as FINN's attorney to represent him, not persecute him. In his September 3, 2014 response to FINN, TOBLER stated, "I will not be taking action on your Request." (Exhibit 41)

83. On July 23, 2014, Brian Olsen was ordered to pay attorney fees and costs in his lawsuit against the city. Federal Judge James Mahan ruled that the case, for which OLSEN was providing his expert opinion, "Screams of frivolity." (Exhibit 42, Page 2, Line 18)

84. On August 4, 2014, FINN received a Right To Sue letter from the EEOC. (Exhibit 43) The Right To Sue letter was dated July 31, 2014. Under *Payan v. Aramark Management Services*, 495 F3d. 1119 (2007), FINN must file suit on or before November 3, 2014.

85. On October 13, 2014, OLSEN entered into a stipulated agreement with the Nevada Commission on Ethics, admitting he acted as his son's expert witness in violation of NRS 281A.065(2) and (3). OLSEN further stipulated to failing in his commitment to avoid conflicts of his private interests and his public duties. OLSEN admitted he used his position in government to secure unwarranted privileges, preferences, exemptions or advantages for his son, a person to whose interests he has a commitment in a private capacity in violation of NRS 281.A400(2). OLSEN admitted he utilized city employees and resources in furtherance of this action, and OLSEN agreed with the Commission that his actions were "willful." Everything OLSEN stipulated to completely contradicted what he claimed in his EEOC response to FINN'S

complaint in February of 2014, and in his answer to the Nevada State Bar in March of 2014. (Exhibit 44).

86. FINN's ethics complaints against WALKER and OLSEN resulted in sustained violations. FINN's Nevada State Bar complaints against OLSEN are currently awaiting a full hearing before the State Bar's Disciplinary Committee.

87. On October 22, 2012, in his taped conversation with FINN, OLSEN says FINN is "[a] police administrator who has nothing but a sterling reputation throughout his entire professional career" and "who has actually sat at the head of the Chiefs' and Sheriffs' Association in the State of Nevada for two years," and further states, "Your credentials…speak volumes about who you are." Less than six months later on April 11, 2013, OLSEN stated to reporter George Knapp regarding FINN, "There is a paranoid, frightened, angry man inside." Subsequent to that statement, on February 26, 2014, OLSEN changed his story by stating, "FINN's employment was terminated because he became paranoid and irrational about his job security and he lashed out at and could not get along with his co-workers. In the course of his downward spiral, FINN became unable to effectively perform his job." In the taped conversation with FINN on October 22, 2012, OLSEN sang FINN's praises, FINN then went on a two-week honeymoon on November 27, 2012, he returned to work for six weeks, then went on FMLA leave in January 2013, and was summarily terminated on April 15, 2014. Not one shred of evidence was presented in the city's response to the EEOC that referenced any irrational or paranoid behavior by FINN for the six weeks in question.

## FIRST CAUSE OF ACTION
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## TITLE I OF THE CIVIL RIGHTS ACT OF 1991

88. FINN re-alleges the foregoing paragraphs 1-87 of this complaint.

89. This is an action under the Age Discrimination in Employment Act, (ADEA), Title VII of the Civil Rights Act of 1964, and Title I of the Civil Rights Act of 1991 to correct alleged unlawful employment practices on the basis of age and religion and to provide appropriate relief to Thomas FINN, an individual who does not belong or subscribe to the religion of the Church of Jesus Christ of Latter Day Saints (LDS) who was adversely affected by discriminatory practices. Defendants, CITY OF BOULDER CITY, discriminated against FINN by denying him equal opportunity for employment because of his religion, non-LDS.

Defendants additionally discriminated against FINN because he would not do favors for members of the LDS Church, outside the scope of his normal job duties as Chief of Police of Boulder City. Defendants further violated Title VII and ADEA by retaliating against FINN by terminating his employment after he complained of Defendants' management practices through complaints to the Nevada Commission on Ethics and the Nevada State Bar. Defendants also printed, or caused to be printed, derogatory and retaliatory remarks against FINN in violation of both Title II, Section 704(b) and ADEA, 29 U.S.C. § 623(e) and Title VII, Section 709(c), 29 C.F.R. §1602.14, and Section 7 of the ADEA, 29 U.S.C. §626 (a), 29 C.F.R. 1627.3

90. This suit is brought pursuant to the "RIGHT TO SUE LETTER" received by FINN from the U.S. Equal Employment Opportunity Commission, dated July 31, 2014, received August 4, 2014, and is timely filed within the 90 days, as required under Title VII, The Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the in Employment Act as well as under the Ninth Circuit Court of Appeals in the case of *Payan v. Aramark Management Services*, 495 F3d. 1119 (2007) (Exhibit 43)

**FIRST CLAIM FOR RELIEF EEOC ACTION**

91. FINN re-alleges the foregoing paragraphs 1-90 of this complaint.

92. Since at least May of 2012, Defendants have engaged in unlawful employment practices within the State of Nevada in violation of Section 703(a) of Title VII, 42 U.S.C.§ §2000e-2(a) by discrimination against a class of individuals of which FINN is a member, on the basis of religion.

93. The effect of the practices complained of in paragraphs 1-89 above has been to deprive equal employment treatment by individuals who are non-LDS.

94. The unlawful employment practices complained of in 1-89 were intentional.

95. The unlawful employment practices complained of in 1-89 were and are done with malice and reckless indifference to the federally-protected rights of individuals who are non-LDS.

**SECOND CLAIM FOR RELIEF EEOC**

96. FINN re-alleges the foregoing paragraphs 1-95 of this complaint.

97. Since at least May of 2012, Defendants have engagd in unlawful employment practices in violation of Section 623(d) of the ADEA, 29 U.S.C. §623(d), and/or Section 704(a)

of Title VII, 42 U.S.C. § 2000(e)-3(a), by failing or refusing to treat FINN as outlined in the City Charter, and to conspire with fellow LDS members against FINN, and because FINN complained of officials' treatment.

98. The effect of the practices complained of above has been to deprive FINN of equal opportunity employment protection and otherwise adversely affect his ability to perform his job by practices he reasonably believes to be illegal.

99. The unlawful employment practices described above were intentional, done willfully and/or with malice or reckless indifference to the federally-protected rights of FINN.

## SECOND CAUSE OF ACTION
## (MALICIOUS RETALIATION BY DAVID OLSEN)

100. FINN re-alleges the foregoing paragraphs 1-99 of this complaint.

101. Since at least May of 2012, Defendant OLSEN has personally engaged in unlawful employment practices in violation of Section 623(d) of the ADEA, 29 U.S.C. §623(d), and/or Section 704(a) of Title VII, 42 U.S.C. § 2000(e)-3(a), by failing or refusing to treat FINN as outlined in the City Charter, and to conspire with fellow LDS members against FINN, and because FINN complained of officials' treatment.

## THIRD CLAIM FOR RELIEF ON OLSEN'S MALICIOUS RETALIATION

102. FINN re-alleges the foregoing paragraphs 1-101 of this complaint.

103. The effect of the practices complained of above has been to deprive FINN of equal opportunity employment protection and otherwise adversely affect his ability to perform his job by practices he reasonably believes to be illegal.

104. The unlawful employment practices described above were intentional, done willfully and/or with malice or reckless indifference to the federally-protected rights of FINN.

## THIRD CAUSE OF ACTION
## TORTIOUS DISCHARGE
## PUBLIC POLICY TORT

105. FINN re-alleges the foregoing paragraphs 1-104 of this complaint.

106. FINN filed an EEOC complaint on March 8, 2013 for religious discrimination.

107. FINN returned to work on April 15, 2013.

108. FINN was fired without cause within the first fifteen minutes of his return.

109. BOULDER CITY dismissed FINN in retaliation for acts which are consistent with and/or supportive of sound public policy and the common good.

110. As Chief of Police of Boulder City, FINN was charged with, and responsible for, the well-being and safety of all residents and visitors of Boulder City.

111. By trying to force FINN to give preferential treatment to LDS Members and their friends, FINN was being asked to discriminate against the public good for the other members of the Boulder City community as alleged in paragraphs 1-109.

**FOURTH CLAIM FOR RELIEF**
**TORTIOUS DISCHARGE**
**PUBLIC POLICY TORT**

112. FINN re-alleges the foregoing paragraphs 1-111 of this complaint.

113. Since on or before 2010, Defendants have engaged in unfair practices against non-LDS members by giving preferential treatment to LDS members. This is in direct violation of the 14th Amendment to the United States Constitution, which mandates that all individuals in similar situations be treated equally by the law. Asking FINN to give preferential treatment to LDS members by not giving them tickets, not towing their cars or allowing them to step outside the boundaries of city policy and state law, is in violation of the 14th Amendment. (Exhibit 45)

114. FINN turned in his employers for this action to the EEOC on March 8, 2013. The Nevada Supreme Court found in *Wiltsie v. Baby Grand Corp.,* 774 P.2D 432 (1989) that firing an employee for reporting his employer's illegal activity violates the public policy of Nevada.

115. The Court found that to meet the standard under *Wiltsie,* the employee must report the activity to the appropriate authority. FINN did.

116. In *Hansen v. Harrah's*, 100 Nev. 60, 675 P.2d 394 (1984), a public policy tort exists when an employer dismisses an employee in retaliation for the employee doing acts which are consistent with or supportive of sound public policy and the common good.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**

117. FINN re-alleges the foregoing paragraphs 1-116 of this complaint.

118. FINN was hired as the Chief of Police of Boulder City on March 22, 2006. Under the terms of his agreement when hired, he was paid an annual salary, was head of the police department and was given a car and uniform allowance and was required by the terms of his

agreement to reside at all times in Boulder City.

119. During the times of his employ, FINN was repeatedly praised by the city manager, the city council, the Mayor and his fellow department heads.

120. According to TOBLER'S State of the City Address on January 26, 2012:

> "Our police department once again provided exemplary service in 2011. While Boulder City's police officers do a superb job of protecting our residents, their success in making Boulder City one of the safest cities in Nevada would not be possible without their strong partnership with the community.
>
> According to the FBI's Uniform Crime Reports from 2006 through 2010, crime in our city has dropped significantly. Violent crimes, which include murder, rape, robbery and aggravated assault, dropped by 26%. …Our low crime rate is particularly impressive when one realizes that we are situated within 25 miles of Las Vegas, a city with a worldwide reputation for "anything goes."

121. By TOBLER'S own admission in 2012, crime fell 26% percent during FINN's tenure as Chief of Police.

122. According to recently released statistics, Boulder City was the safest city to live in 2012, based on the FBI's 2012 Uniform Crime Reports (Exhibit 3), which was during FINN's reign as Chief of Police.

## FIFTH CLAIM FOR RELIEF
## BREACH OF IMPLIED CONTRACT

123. FINN re-alleges the foregoing paragraphs 1-122 of this complaint.

124. The Court recognized an exception to the implied-in-fact exception to the at-will doctrine in *Southwest Gas Corp. v. Ahmad*, 99 Nev. 594, 668 P.2d 261 (1983). FINN'S requirement where he had to live in the city, inferentially formed part of an employment contract, and form the basis for a contractual agreement in derogation of an at-will status.

## FIFTH CAUSE OF ACTION
## VIOLATION OF FMLA

125. FINN re-alleges the foregoing paragraphs 1-124 in this complaint.

126. FINN was an "eligible employee" and BOULDER CITY was a "covered employer" for purposes of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§2611-2654, as

the term is specifically defined at 29 U.S.C. §2611(4).

127. For the time period in question, BOULDER CITY was required to offer any "eligible employee," as that term is defined under 29 U.S.C. §2611(2), up to 12 weeks of leave "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

128. FINN took medical leave under FMLA from January 16, 2013 to April 14, 2013.

129. BOULDER CITY immediately fired FINN upon his returning to work from FMLA leave on April 15, 2013.

130. BOULDER CITY hired William Conger, nephew of COUNCILWOMAN PEGGY LEAVITT, as a part-time "acting chief of police" while FINN was on FMLA leave, despite the fact that Conger was no longer certified as a sworn peace officer. Because he was not a sworn peace officer, Conger was required to attend a police academy during his first year of employment. He did not. Therefore, after FINN was fired the city created a new title and hired William Conger as the "Chief of Police Administration," which is a civilian, non-sworn position. The city also orchestrated salary payments to Conger as a "contract employee" through a California staffing company so Conger could continue to collect his Nevada pension.

## SIX CLAIM FOR RELIEF
## VIOLATION OF RIGHTS UNDER FMLA

131. FINN re-alleges paragraphs 1-130 of this complaint.

132. BOULDER CITY violated 29 U.S.C. §2615(a)(1) by terminating FINN at the end of his FMLA leave.

133. Under FMLA, the employer of an employee returning to work must employ the employee in their former position or one substantially similar, if the employee did not go over the prescribed period of time and notified the employer immediately when the leave was taken.

134. FINN complied with all aspects of FMLA and was summarily terminated within fifteen minutes of returning to work, with no explanation and for no cause.

135. The **FMLA** creates two interrelated substantive rights for employees. *Bachelder v. America West Airlines,* 259 F.3d 1112, 1122 (9th Cir. 2001). First, an employee has the right to take up to twelve weeks of leave for the reasons described above. 29 U.S.C. § 2612(a).

Second, ***an employee who takes FMLA leave has the right to be restored to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return*** from leave. 29 U.S.C. § 2614(a). The **FMLA** does not entitle the employee to any rights, benefits, or positions they would not have been entitled to had they not taken leave. 29 U.S.C. § 2614(a)(3)(B). The FMLA simply ***guarantees that when employees take leave it will not result in a loss of job security or in other adverse employment actions***. *Liu v. Amway Corp.,* 347 F.3d 1125, 1132 (9th Cir. 2003) (emphasis added).

136. "[A]n employee who takes **FMLA** leave has the right to be restored to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return." *Liu,* 347 F.3d at 1132. According to 29 U.S.C. § 2614(a)(1):

137. Further, under FMLA there is a limited exception to reinstating the employee and that is if there is "Substantial and grievious economic injury" an employer may refuse to reinstate certain "key" employees, providing that the employer notified the employee of his "key" status and reasons for denying the reinstatement. Nothing of the kind was done with regard to FINN.

138. Under FMLA an employer cannot fire an employee and replace him with a less qualified individual at a reduced rate of pay. FINN was fired, without cause, the day he returned from FMLA and replaced with someone, less qualified, at a lower rate of pay.

## SIXTH CAUSE OF ACTION
## VIOLATION OF "PEACE OFFICERS' BILL OF RIGHTS"

139. FINN was a Peace Officer as defined under Nevada Revised Statute 289.010 (3). He is entitled to judicial relief for an aggrieved peace officer under Nevada Revised Statute 289.120.

140. On January 9, 2013, BRYCE BOLDT, Human Resources Director of BOULDER CITY, sent an email to Police Officer David Olson (unrelated to Attorney DAVID OLSEN), stating, "I am conducting an administrative investigation into an allegation regarding the Chief of Police and it has been brought to my attention that you may have information regarding the allegation. I'd like you to contact me tomorrow when you are available to come to my office." (Exhibit 23) FINN had already put BOLDT on notice on December 30, 2012 when he was told

that BOLDT would be opening an investigation regarding an allegation FINN looked up a license plate without authority. (Exhibit 22)

141. Acting City Manager Scott Hansen told FINN he was contacted on December 17, 2012 by City Manager-select FRASER and told that FINN was using an on-duty detective to conduct an investigation that would benefit FINN'S lawsuit. FINN assured Hansen that the only investigation he was conducting was whether the "anonymous fax" he received on November 27th was authentic and, if it was, it would most certainly have jeopardized the lives of Stephen Stubbs and his family. (Exhibit 46)

142. FINN asked Hansen why FRASIER, who had not yet began his term as city manager, was privy to FINN'S confidential employee information. Hansen had no answer other than to tell FINN to close out the investigation.

143. FINN told BOLDT in the December 30, 2012 email that "Please consider this email as formal notice to you and the city that I will most certainly assert my NRS 289 rights as a peace officer if the city conducts any investigations into my performance." (Exhibit 21).

144. FINN was never told he was being investigated.

145. FINN was never afforded his NRS Chapter 289 Peace Officer rights.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF NRS CHAPTER 289 RIGHTS

146. FINN re-alleges the foregoing paragraphs 1-145 of this complaint.

147. NRS 289.080(6) states that the Peace Officer is entitled to a copy of their administrative and investigative file, including notes, transcripts and other documents, related to the investigation.

148. FINN was investigated twice between December 2012 and January 2013. FINN was never afforded his NRS Chapter 289 rights, nor was he even notified of the "secret investigations."

149. FINN was fired from his job without cause immediately upon returning from FMLA leave. If FINN was fired for any act or omission that would have triggered his NRS Chapter 289 rights, he had the right to know that information, and he had the right to assert those rights. If anything was written up about FINN or placed in FINN'S administrative/personnel file, FINN had the right to read the documents and initial them. If FINN disagreed with what was in

the documents then he had the right to submit a written rebuttal to be included in his file. FINN'S statutory rights as a Nevada Peace Officer were completely dismissed by the city.

**PRAYER FOR RELIEF**

150. Wherefore, FINN respectfully requests that this Court:

A. Order Defendants to make FNN whole by providing back pay with prejudgment interest in the amounts to be determined at trial and other affirmative relief necessary to eradicate the effect of its unlawful employment practices.

B. Grant judgment requiring Defendants to pay appropriate back wages in an amount to be determined at trial, an equal sum as liquidated damages, and prejudgment interest to FINN.

C. Order Defendants to make FINN whole by providing compensation for past and future pecuniary losses resulting from the unlawful practices described above, in amounts to be determined at trial.

D. Grant such further relief as the Court deems necessary and proper and in the public interest.

E. Award FINN his costs and fees in this action.

DATED this 3rd day of November, 2014.

/s/Sean P. Flanagan
Sean P. Flanagan
Nevada Bar Number 5304
FLANAGAN, LTD.
7251 W. Lake Mead Blvd., Suite 300
Las Vegas, Nevada 89128
(702)562-4111
(702)562-4117

Attorney for Plaintiff