# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Thomas Finn,

      Plaintiff

v.

City of Boulder City, et al.,

      Defendants

2:14-cv-01835-JAD-GWF

**Order Re: Motions for Summary Judgment**

[ECF Nos. 106, 109, 110]

      Former Boulder City Chief of Police Thomas Finn sues the City of Boulder City, its former City Attorney and Mayor, and several former and present City Council members for religious discrimination, retaliation, tortious discharge, breach of implied contract, violations of the Family Medical Leave Act (FMLA), and violations of Nevada's Peace Officers' Bill of Rights after his 2013 termination.[1]  The parties have filed cross motions for summary judgment. Although Finn offers a torrent of facts, his failure to tie them to his claims and cognizable legal theories throughout three separately briefed motions for summary judgment compels me to deny his motions and grant the defendants' motion.[2]

## Factual Summary[3]

      Thomas Finn was sworn in as the Boulder City Chief of Police on March 22, 2006, and he served in that capacity for seven years.  Finn's offer letter expressly stated that he was an at-will employee and that nothing could alter that employment status except a writing signed by the

---

[1] ECF No. 26.

[2] I find these matters suitable for disposition without oral argument.  L.R. 78-1.

[3] Though Finn offers scores of pages of facts, when I tested them against the record, most were subjective inferences or otherwise incapable of confirmation.  This factual summary is based on the confirmable record evidence.

City Manager.[4]  The City Manager who hired Finn was Vicky Mayes.[5]

Finn's tenure appeared to go smoothly until 2012, when tensions began to flare between Finn, a local attorney, and various persons in management-level positions within the Boulder City government.  Finn contends that he was asked to do law-enforcement-related favors for friends or family members of then-City Attorney Dave Olsen and then-Mayor Roger Tobler—both members of the Mormon Church—but he declined the requests.  Then in June 2012, the Mongols Motorcycle Club planned to rally in Boulder City, and their attorney, Stephen Stubbs (also a member of the Mormon Church), tried to coordinate the event with the City Council and the police department.  Finn sent out a department-wide email ordering his officers to delete all correspondence about the rally and its security from their computers.  When City Councilman Cam Walker asked Finn to give Stubbs a call, Finn refused.

The day after the rally, Stubbs filed a federal civil-rights complaint against the Las Vegas Metropolitan Police Department (LVMPD) and North Las Vegas Police Department (NLVPD).[6] Stubbs later added Finn as a defendant based on an email that Finn sent to defendant City Attorney Olsen (which Olsen apparently shared with Stubbs) in which Finn stated that law enforcement was going to have a zero-tolerance policy during the rally weekend—no deals would be made with anyone for any citations.  Stubbs later learned about the delete-email instruction that Finn sent to the police department regarding the Mongols' rally and wrapped those facts into his lawsuit, too.

City Manager Mayes announced in May of 2012 that she was retiring at the end of the calendar year, and Finn contends that "[f]rom the time Mayes announced her retirement, until Mayes retired in December 2012, Councilman Walker, Mayor Tobler, and City Attorney Olsen

---

[4] ECF No. 109-1.

[5] *Id*.

[6] ECF No. 122-7 at 79.

worked behind the scenes" to get Finn ousted.[7]  Councilman Walker expressed to Mayes that he felt disrespected by Finn's refusal to return Stubbs's calls at his behest.[8]  Walker also asked City Attorney Olsen if Finn should be placed on administrative leave.[9]  Olsen "took a very strong stance" to City Manager Mayes that the delete email "was a real problem with the public records law."[10]

On November 21, 2012, Finn sued Olsen, Walker, Stubbs, and two others in state court, alleging that they "intentionally interfered with FINN's contractual relationship with Boulder City" and "caused such damage to FINN's reputation that it is highly unlikely that [he] could obtain employment as a Chief of Police."[11]  Vicky Mayes testified that she believes that when Finn filed that lawsuit "several of the council members took it as personal and then felt they could no longer support him as chief because he filed that lawsuit against the City."[12]  She said that "individual council members" including Roger Tobler and Cam Walker, but maybe others, "came to [her] and said 'I can't believe the chief has filed a lawsuit against the City.  This isn't the right way to handle it.  And I don't believe I can support him as chief any longer because of that action.'"[13]  They expressed that they could no longer support Finn as Chief "because he had filed the lawsuit and asked for settlement."[14]

Finn claims that the defendants he targeted by his lawsuit retaliated by ordering an audit

---

[7] ECF No. 26 at ¶ 16.

[8] ECF No. 122-8 at 48–49.

[9] ECF No. 122-13 at 13–14.

[10] ECF No. 122-8 at 51, p.194.

[11] *See* Complaint filed in Eighth Judicial District Court Case No. A-12-672438-C on 11/21/12, at ¶ 49, which I take judicial notice of.

[12] ECF No. 122-8 at 20, p.73.

[13] *Id*. at 21–22.

[14] *Id*. at 22.

of the Boulder City Police Department and its "policies, procedures and practices" in December 2012.[15]  The City contracted the audit work out to the International City/County Management Association.[16]  A separate investigation into Finn's conduct was undertaken by the Nevada Attorney General's Office.[17]

Mayes retired as City Manager in mid-December 2012, and the City Council appointed David Fraser, another member of the Mormon Church, as her successor.  Fraser took office on January 15, 2013, and Finn went on Family and Medical Leave Act (FMLA) on January 16, 2013.  On March 8, 2013, while still on leave, Finn filed a complaint with the U.S. Equal Employment Opportunity Commission (EEOC) alleging religious and age discrimination.  On March 12, 2013, City Manager Fraser appointed William Conger, nephew-by-marriage of City Councilwoman Peggy Leavitt, as Acting Chief of Police.[18]  Though Conger was raised Mormon, he converted to Greek Orthodoxy in 1982.[19]

When Finn returned from FMLA leave on April 15, 2013, Fraser gave him the option of resigning or being terminated; he refused to resign and was terminated.[20]  Finn received his right-to-sue letter from the EEOC on August 4, 2014.[21]  He filed this lawsuit on November 3, 2014, naming as defendants the City, Olsen, Tobler, Walker, Leavitt, former City Councilman Duncan McCoy, and former City Councilman (now Mayor) Rod Woodbury.[22]  Finn's original complaint was nearly impossible to follow, and I granted the defendants' motion for a more definite

---

[15] ECF No. 122-15.

[16] ECF No. 128-3.

[17] ECF No. 109-10.

[18] ECF No. 123-4 at 13, 23–24.

[19] *Id*. at 110.

[20] ECF No. 109 at 10.

[21] ECF No. 26-1 at 15.

[22] ECF No. 1.

4

statement and directed Finn to amend.[23]  He did.  Finn's First Amended Complaint pleads claims for religious discrimination in violation of Title VII, retaliation, tortious discharge, breach of an implied employment contract, violation of the FMLA, and violation of the Peace Officers' Bill of Rights, NRS 289.010 et seq., though it is still not clear which claims are pled against which defendants.[24]

Central to several of Finn's claims is the issue of church membership.  He theorizes that the defendants discriminated against him because they are members of the Church of Jesus Christ of Latter-Day Saints (LDS/Mormon), while he is not.  He points out that Stubbs, Walker, Olsen, Leavitt, Tobler, Woodbury,[25] and Fraser are all members of the LDS church, and even his replacement Conger was raised Mormon, while he and Mayes are not.

Discovery has closed,[26] and all parties ask for summary adjudication of various claims. Finn seeks summary judgment on his FMLA violation claim and his Peace Officers' Bill of Rights claim, arguing that the undisputed facts compel judgment in his favor.[27]  Characterizing Finn's case as one resting "on a patchwork of discrete and unrelated events stitched together in hindsight" and grounded only in "speculation and paranoia," the defendants move for summary judgment in their favor on all of Finn's claims.[28]  I consider each argument in turn, moving in order of the claims as pled.

---

[23] ECF No. 24.

[24]  ECF No. 26 (first amended complaint).

[25] It appears that (former City Councilman/now Mayor) Woodbury was named in this action simply because of his position as a City Councilman.  Finn alleges only that Woodbury failed to disclose that his father assisted Stubbs in the civil-rights action against the police departments and Finn, but that nondisclosure is irrelevant to these claims.  ECF No. 26 at ¶¶ 32, 45, 74, 76, 82(c).  Finn even mentions that Woodbury opposed the police-department audit.  *Id.* at ¶ 47.

[26] ECF No. 91 (scheduling order/ninth extension).

[27] ECF Nos. 106, 110.

[28] ECF No. 109 at 3.

**Standards of Review**

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[29] When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[30] If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[31]

If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[32] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; he "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in his favor.[33]

Because the plaintiff bears the burden of proof at trial, before the court can grant a plaintiff's motion for summary judgment, he "must establish 'beyond controversy every element of'" his claim.[34] The existence of genuine, disputed facts as to any element requires the court to

---

[29] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[30] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[31] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[32] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[33] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson,* 477 U.S. at 248–49.

[34] *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (quoting William W Schwarzer, et al., California Practice Guide: Federal Civil Procedure Before Trial § 14:124–127 (2001)).

deny the motion and let the jury decide which version of the facts to believe.[35]  But a defendant who moves for summary judgment on a plaintiff's claim need show the absence of evidence for just one element of any challenged claim.[36]

## Discussion

**A.     First claim for relief: religious discrimination in violation of Title VII**

As his first claim, Finn alleges that the defendants discriminated against him in violation of Title VII because he's not a member of the Mormon Church.[37]  The United States Supreme Court established in *McDonnell Douglas Corp. v. Green* a burden-shifting framework for such discrimination cases.[38]  "A discrimination complainant must first establish a prima facie case of disparate treatment."[39]  "In general, a plaintiff must present evidence of 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such action was based upon race or another impermissible criterion.'"[40]  If the plaintiff presents a prima facie case, "the burden shifts to the defendant to produce some evidence demonstrating a legitimate, nondiscriminatory reason for the employee's termination."[41]  And if the defendant meets that burden, "any presumption that the defendant discriminated 'drops from the case,' and the plaintiff must then show that the defendant's alleged reason for termination was merely a pretext for discrimination."[42]

---

[35] *Id*.

[36]  *Celotex,* 477 U.S. at 322.

[37] ECF No. 26.

[38] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[39] *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004) (internal citations and quotations omitted).

[40] *Id*. (quoting *Gay v. Waiters' Union*, 694 F.2d 531, 538 (9th Cir. 1982)).

[41] *Id.*

[42] *Id.*

Finn claims that, because he was not a member of the LDS Church, the Boulder City political elite—the City Council, Mayor, and the City Attorney—discriminated against him by subjecting him to a hostile workplace, federal lawsuits, and public ridicule; firing him without cause; and replacing him with Councilwoman Leavitt's nephew who was unqualified for the job.[43] Finn's claim is essentially for reverse religious discrimination: he claims that he was treated unfairly not because of the beliefs he holds but because he did not share the religious beliefs promoted by those in charge.

The Ninth Circuit adapted the *McDonnell Douglas* burden-shifting framework for reverse-discrimination claims in *Noyes v. Kelly Services*:

> A prima facie case of employment discrimination may be established through direct evidence of discriminatory intent *or* a presumption arising from a showing of objective factors such as those outlined in *McDonnell Douglas* and its progeny. In *Godwin v. Hunt Wesson, Inc.*,[44] we adapted *McDonnell Douglas* to the failure to promote context, holding that a prima facie case requires the employee to show: "(1) she belongs to a protected class, (2) she was performing to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably."

> Although we have not previously outlined the precise contours of a prima facie showing of reverse religious discrimination, the district court's application of *Godwin* in this context was appropriate. The district court concluded that Noyes'[s] evidence was sufficient to make out a prima facie case of disparate treatment with respect to the promotion at issue, and Kelly Services does not challenge that conclusion on appeal. Of course, the "protected class" element is not comparable because **Noyes does not claim she was part of a protected class, i.e., that she adheres to a particular religion. Rather, her claim is that her lack of adherence to the religious beliefs promoted by the management of Kelly Services was the genesis of the discrimination.**

> The Tenth Circuit's discussion on this point is instructive. In *Shapolia v. Los Alamos National Laboratory*,[45] the court reasoned that **the "protected class" showing required in a traditional race or sex discrimination claim does not apply to this type of**

---

[43] ECF No. 26 at 15–16.

[44] *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217 (9th Cir. 1998).

[45] *Shapolia v. Los Alamos National Laboratory*, 992 F.2d 1033 (10th Cir. 1993).

**non-adherence or reverse religious discrimination claim because "it is the religious beliefs of the employer, and the fact that the employee does not share them, that constitute the basis of the religious discrimination claim."**[46] We recognize, as did the district court, that it is appropriate to tailor the elements of a prima facie showing according to the particular circumstances of each case.[47]

So, to prevail on his reverse-religious-discrimination claim, Finn "must show (1) that he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, [his] job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon [his] failure to hold or follow his . . . employer's religious beliefs."[48] If he can provide evidence to support each of these elements, Finn is entitled to a presumption of reverse religious discrimination. The burden would then shift to the defendants to provide legitimate, nondiscriminatory reasons for terminating Finn. If they do, the presumption is overcome, and Finn must then show that the proffered reasons are pretextual.

Finn falters at the first hurdle because he fails to offer evidence to establish a prima facie case. Although his termination is an adverse employment action, and Finn presents enough evidence to create a genuine dispute regarding his job performance, he presents no evidence from which I can draw the inference that he was fired because he was not a member of the Mormon Church.

Finn attempts to clear this hurdle by providing a dozen instances of alleged favoritism towards Mormon members of the political elite,[49] but those instances either have no connection to him, do not demonstrate that others received better treatment than he did in comparable circumstances, or are undermined by his own testimony. For example, Finn testified that his

---

[46] *Id.* at 1038 (emphasis added).

[47] *Noyes*, 488 F.3d at 1168–69 (emphasis added).

[48] *Shapolia*, 992 F.2d at 1038.

[49] ECF No. 129 at 35–39.

continued employment and future promotions and raises were not conditioned on his Mormonism, and he received a raise "in line with what the other department heads got."[50]  Finn's replacement William Conger was also not a member of the Mormon Church.  Finn argues that Conger was raised Mormon and that his aunt, defendant Councilwoman Leavitt is Mormon, so Conger's employment should be considered another example of Mormon favoritism.  But Conger converted and left the Mormon religion for Greek Orthodoxy decades ago.[51]  At best, Finn has shown that some people in Boulder City, who are also members of the Mormon Church, experienced unrelated, favorable treatment by a dozen different City officials.  But I cannot draw from these events an inference that Finn was fired "because of a discriminatory motive based on" his failure to hold or follow Mormon beliefs.[52]

Finn's claim relies almost entirely on Vicki Mayes's personal opinion that incompetent Mormon city employees were retained in their positions while incompetent non-Mormon city employees were terminated.[53]  But even that opinion was equivocal.  When asked if there is favoritism towards Mormons in Boulder City, Mayes opined "There may be. . . . There are certain things that maybe would suggest that . . . but it's not something that, I don't think, anyone could necessarily prove."[54]  Identifying the events that she felt suggested a Mormon preference in employment practices, Mayes noted: "Dave Fraser (her replacement) was absent during his initial period of being hired and has a history of absenteeism on the job, which I could only say that for me, I would not have been retained under those circumstances."[55]  And she speculated, "I know

---

[50] ECF No. 109-6 at 26.

[51] ECF No. 131-2 at 3.

[52] *Shapolia*, 992 F. 2d at 1038.

[53] ECF No. 122-8 at 6.

[54] *Id.* at 5 (ellipses in transcript to denote pauses).

[55] *Id.*

for a fact that I would not have been retained under those circumstances.  Let's just say that."[56]
But even Mayes did not identify actual events or unfair treatment that she (a non-Mormon)
received during her tenure as Boulder City's City Manager from 2005 to 2012—a position from
which she voluntarily retired.[57]

Even if I were to find that Mayes's speculation and Finn's examples of Mormon
favoritism satisfied Finn's burden to establish a prima facie case, the defendants have offered
non-discriminatory reasons for his termination, and Finn has not countered with evidence that
those reasons were mere pretext.  Among the justifications, the defendants note that: the Boulder
City Police Patrolmen's Association issued a vote of no confidence against Finn; Finn was an at-
will employee who could be terminated for any or no reason as long as it did not violate public
policy; the new, incoming City manager wanted to establish his own administration; and an audit
of the police department revealed discontentment with Finn's leadership.[58]  Finn has not shown
that these reasons were pretext for his rejection of Mormon beliefs, especially when his
replacement was not Mormon.  I therefore grant summary judgment in favor of the defendants on
Finn's religious-discrimination claim.

**B.   Second claim for relief: retaliation in violation of Title VII against Walker, Tobler, Olsen, Woodbury, and Boulder City**

In his second cause of action, Finn alleges that Walker, Tobler, Olsen, Woodbury, and
Boulder City violated Title VII by firing him or influencing Fraser to fire him in retaliation for
filing a charge of religious discrimination with the EEOC.[59]  But when the defendants challenged

---

[56] *Id.*

[57]  ECF No. 122-8 at 6, 165.

[58] ECF Nos. 109 at 17; 131 at 4–7.

[59] ECF No. 26 at 16.  This claim also contains a reference to the Age Discrimination in
Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq., but it appears that this reference is
merely a vestige from the prior version of the complaint, which contained a now-abandoned age-
discrimination theory.  *See also* ECF No. 131 at 1, n.1 (footnoting—without a docket
reference—that "Plaintiff previously voluntarily dismissed his age discrimination claim.").

this claim on summary judgment, Finn's theory changed. He now argues that he "was terminated in retaliation for his filing suit against a member of the city council and the city attorney."[60] Finn argues that he will support this retaliation claim with the testimony of two witnesses—Stubbs[61] and Mayes—whom, he contends, will testify that Olsen and the Councilmen mentioned that they could no longer work with Finn because he filed a lawsuit against them.[62]

Mayes testified at deposition that "individual council members came to [her] and said, 'I can't believe the chief has filed a lawsuit against the City. This isn't the right way to handle it. And I don't believe I can support him as chief any longer because of that action.'"[63] And when Mayes warned Tobler that "Employees, under the law, have a right" to take legal action, he responded, "Well, I do take it personal."[64] Although these facts suggest that Tobler was in a retaliatory mindset,[65] it's not the type of retaliation actionable under Title VII.

The lawsuit that Tobler was referring to—and for which Finn now theorizes he was fired—was Finn's November 2012 state-court lawsuit against Stubbs, John Chase, Cam Walker,

---

[60] ECF No. 129 at 28, 29.

[61] Finn does not offer me a record citation for the Stubbs testimony, *see* ECF No. 129 at 28, and my hunt for it turned up no truffles. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

[62] ECF No. 129 at 28.

[63] ECF No. 122-8 at 21.

[64] *Id*. at 22.

[65] Plus, Tobler didn't fire Finn—Fraser did. ECF No. 26 at ¶ 64. So, Finn must also demonstrate that Tobler's actions precipitated his termination by Fraser. *See, e.g, Poland v. Chertoff*, 494 F.3d 1174, 1181 (9th Cir. 2007) ("if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process."). Because Finn's claim fails at the protected-activity prong, I need not and do not consider whether the evidence supports an imputed-bias retaliation theory.

Dave Olsen, and Dan Jennings.[66]  Though far from a model of clarity, that complaint alleges intentional interference with contractual relations and perhaps defamation.[67]  But for retaliation to be capable of redress under Title VII, it must be for conduct protected by Title VII or performed in conjunction with a Title VII "investigation, proceeding, or hearing."[68]  Title VII forbids only discrimination based on "race, color, religion, sex, or national origin."[69]  And Finn's November 2012 state-court lawsuit did not raise Title VII claims or allege any other conduct protected by Title VII.  Indeed, his Title VII religious-discrimination allegations did not surface until he filed his EEOC charge months later in March 2013.[70]

    "To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action."[71]  Finn's Title VII retaliation claim fails at the first and third elements.  His state-court lawsuit was not an activity protected by Title VII, so he cannot demonstrate a causal link between Title VII-

[66] *See* ECF No. 129 at 11:4–13 (noting that it was "[a]fter the" state "lawsuit was filed Councilman Walker and Mayor Tobler approached Vicki Mayes and expressed to her that they could no longer work with Finn because he had filed suit against them").

[67] *See* Complaint filed in Eighth Judicial District Court Case No. A-12-672438-C on 11/21/12, at ¶ 49; *see also* ECF No. 129 at 11, l. 6–7 (wherein Finn characterizes that lawsuit as one "for interfering with his right to perform his job under his contract").

[68] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006).

[69] 42 U.S.C. § 2000e-2(a)(2) (2012).

[70] ECF No. 26 at ¶ 61; 26-1 at 15 (right-to-sue letter).  Although Finn states in his affidavit in opposition to the defendants' motion for summary judgment that he "expressed his concerns" about being "treated differently than other employees of the city, in that favoritism was shown to LDS member employees that was not afforded non-Mormons" to "City Manager Vicki Mayes, several times," *see* ECF No. 122-1 at ¶ 17, he does not identify the dates of those communications, such that an issue of fact can be raised.  And he does not contend that Mayes—whom he characterizes as having been in his corner—ever communicated those concerns to any other City employee.

[71] *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (citing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994)).

13

protected activity and his termination.  I therefore grant summary judgment in defendants' favor on this Title VII retaliation claim.

**C.     Third claim for relief: "malicious retaliation" against Olsen only**

Finn pleads a separate claim against Olsen, entitled "Malicious Retaliation."[72]  In this third cause of action, he alleges that Olsen "has personally engaged in unlawful employment practices in violation of" the ADEA and Title VII "by failing or refusing to treat [him] as outlined in the City Charter, and to conspire with fellow LDS members against [him], and because [he] complained of officials' treatment."[73]

Finn's Title VII retaliation claim fails against Olsen for the same reasons it fails against the other defendants.  Despite the broad allegations in his complaint, when pressed by the defendants on summary judgment, Finn clarified that "his termination was in retaliation for filing" his 2012 state-court lawsuit.[74]  But, as I explained above, that lawsuit was not Title VII-protected activity.  And even if it were, Title VII only subjects employers to liability, not individual employees like Olsen.[75]  So Finn's Title VII retaliation claim against Olsen fails as a matter of law.

I presume that Finn's reference to the ADEA is an unintentional vestige of his previously dismissed claim for age discrimination, as he pleads zero age-discrimination facts in his amended complaint.  And even if he had pled facts to support an age-discrimination-based-charge retaliation claim, it would fail against Olsen as a matter of law because, "[t]he liability schemes under Title VII and the ADEA are essentially the same in aspects relevant to this issue; they both

---

[72] This is not a recognized cause of action, so, I construe it as a standard retaliation claim under Title VII and the ADEA.

[73] ECF No. 26 at 17.

[74] ECF No. 129 at 28, 29.

[75] *Ortez v. Washington Cty., State of Or.*, 88 F.3d 804, 808 (9th Cir. 1996) (citing *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583 (9th Cir. 1993), *cert. denied*, 510 U.S. 1109 (1994)) ("employees cannot be held liable in their individual capacities under Title VII.").

limit civil liability to the employer."[76]  Accordingly, I grant summary judgment in favor of Olsen on Finn's third claim for relief.

**D.     Fourth claim for relief: tortious discharge**

As his fourth cause of action, Finn claims that Boulder City tortiously discharged him in violation of public policy.  The Nevada Supreme Court "has repeatedly held that 'public policy tortious discharge actions are severely limited to those rare and exceptional cases where the employer's conduct violates strong and compelling public policy.'"[77]  "The essence of a tortious discharge is the wrongful, usually retaliatory, interruption of employment by means which are deemed to be contrary to the public policy of this state."[78]  "An employer commits a tortious discharge by terminating an employee for reasons [that] violate public policy."[79]

Finn pleads that he was fired in retaliation for not giving "preferential treatment to LDS members by not giving them tickets, not towing their cars or allowing them to step outside the boundaries of city policy and state law."[80]  But when defending this claim on summary judgment, he argues only that "his termination was in retaliation for filing suit against members of the city government."[81]  Referencing and block-quoting two pages of the discussion of "the tort of retaliatory discharge" in the Nevada Supreme Court's opinion in *K Mart Corp. v. Ponsock*,[82] Finn

---

[76] *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993).

[77] *Wayment v. Holmes*, 912 P.2d 816, 818 (Nev. 1996) (quoting *Sands Regent v. Valgardson*, 777 P.2d 898, 900 (Nev. 1989)).

[78] *D'Angelo v. Gardner*, 819 P.2d 206, 212 (Nev. 1991).

[79] *Id*. at 216. The *D'Angelo* case consolidates *D'Angelo v. Gardner* (docket no. 20452) with *Western States Minerals Corp. v. Jones* (docket no. 19697) and addresses them in the same order. This particular rule of law comes from the *Western States Minerals* case within the overarching *D'Angelo* case.

[80] ECF No. 26 at 18.

[81] ECF No. 129 at 28, lines 6–7.

[82] *K Mart Corp. v. Ponsock*, 732 P.2d 1364 (Nev. 1987).

states, "As in the *Ponsock* case, Finn was terminated in retaliation for his filing suit against a member of the city council and the city attorney."[83]

Finn overstates *Ponsock* and misunderstands the nature of tortious-discharge claims in Nevada. Ponsock was not terminated for filing a lawsuit; he alleged that he was fired so that his employer did not have to pay out retirement benefits that would soon accrue if he stayed on.[84] The *Ponsock* court cited to *Hansen v. Harrah's*,[85] in which the employee was terminated in retaliation for filing a workmen's compensation claim (still not a lawsuit).[86] But *Hansen* is also materially distinguishable.

The Nevada Supreme Court held in *Hansen* that "Nevada's workmen's compensation laws reflect a clear public policy favoring economic security for employees injured while in the course of their employment."[87] And failing "to recognize the cause of action of retaliatory discharge for filing a workmen's compensation claim would only undermine Nevada's Act and the strong public policy behind its enactment."[88] Allowing employers to discharge employees for filing workmen's compensation claims would "force employees to choose between a continuation of employment or the submission of an industrial claim,"[89] effectively "nullify[ing] the basic purposes of Nevada's workmen's compensation system."[90] The court then adopted "the narrow exception to the at-will employment rule recognizing that retaliatory discharge by an employer stemming from the filing of a workmen's compensation claim by an injured employee

---

[83] ECF No. 129 at 26:22–23.

[84] *Ponsock*, 732 P.2d at 1365.

[85] *Hansen v. Harrah's*, 675 P.2d 394 (Nev. 1984).

[86] *Ponsock*, 732 P.2d at 1369 (citing *Hansen v. Harrah's*, 675 P.2d at 397).

[87] *Hansen*, 675 P.2d at 396.

[88] *Id.*

[89] *Id.* at 397.

[90] *Id.*

1   is actionable in tort."[91]

2       *Hansen*'s principles do not support Finn's tortious-discharge claim, and Finn does not

3   attempt to show that *Hansen*—or any other Nevada authority—supports the notion that his

4   termination is one of the "rare and exceptional cases" in which the termination of an at-will

5   employee is actionable in tort.  Finn filed a civil lawsuit, while Hansen filed an administrative

6   workmen's compensation claim.  Hansen's workmen's compensation claim was encouraged and

7   supported by Nevada's comprehensive, workmen's compensation statutory scheme.  But Finn

8   cites no authority to suggest that Nevada's policy strongly encourages an at-will employee to file

9   a civil lawsuit against a local attorney, a City Councilman, the City Attorney, and other

10  subordinate City employees for tortious interference with contractual relations and perhaps

11  defamation.  In *Kersey v. Costco Wholesale Corp.*, the Ninth Circuit observed that "The Nevada

12  Supreme Court has never held that a private employer who discharges an employee for

13  exercising her constitutional right to access the courts is liable for tortious discharge."[92]  And

14  Finn offers no reason for me to predict that the Nevada Supreme Court would hold that a public

15  employer who discharges an employee for filing a lawsuit is.[93]  I thus grant summary judgment in

16  favor of the defendants on Finn's fourth claim for relief.

17  **E.      Fifth claim for relief: breach of implied contract**

18      Finn's fifth cause of action alleges breach of an implied employment contract.[94]  In this

19  claim, Finn alleges that he was not an at-will employee because he had an "implied contract"

---

21  [91] *Id.*

22  [92] *Kersey v. Costco Wholesale Corp.*, 210 F. App'x 561, 562 (9th Cir. 2006) (unpublished).

23  [93] The *Kersey* panel cited to *Sands Regent v. Valgardson*, 777 P.2d 898, 900 (Nev. 1989), in
24  which the Nevada Supreme Court found that the tort did not apply to an age-discrimination
    claim.  It reasoned that, although "Nevada has a public policy against age discrimination," that
25  policy was not "sufficiently strong and compelling to warrant another exception to the 'at-will'
    employment doctrine."  So, "as objectionable as" age discrimination may be, it "does not rise to
26  the same level as the actionable tortious conduct found in *Hansen* or *K-Mart.*"  *Sands Regent*,
27  777 P.2d at 900.

28  [94] ECF No. 109.

17

with the City, which defendants Tobler, Walker, Olsen, and the City breached "[b]y interfering in [his] ability to perform under" that contract.[95] Defendants move for summary judgment on this claim, arguing that the evidence is clear that Finn was an at-will employee without any contractual relationship.[96] There is no factual basis for this claim.

Few principles in Nevada law are more deeply established than the notion that the employment relationship is presumed to be at will.[97] Recognizing this presumption, Finn argues that his employment was transformed into a for-cause-termination-only one because the Boulder City Personnel Policies Manual contains the terms for discipline and does not include a waiver or exception for administration positions or department heads, thereby entitling the department heads to the same disciplinary rules and protections as other members of the police department. . . . Therefore, the policy manual was part of Finn's contract with" the City.[98] Finn generally cites to *Ponsock* and *D'Angelo v. Gardner* for the proposition that "a policy manual that has disciplinary terms[] and states that employees will only be fired for 'just cause' creates an implied contract."[99]

Finn's reliance on *Ponsock* is misplaced. In *Ponsock*, K Mart *stipulated* that "written provisions of its employee handbook [were] part of the" parties' contract.[100] As a result, "Ponsock [was] a tenured employee," and "K Mart hired him 'until retirement' and for 'as long as economically possible.'"[101] There is no similar stipulation here.

Nor does *D'Angelo* support the conclusion that the Manual transformed Finn's position

---

[95] ECF No. 26 at 19.

[96] ECF No. 109 at 12.

[97] *See, e.g., Dillard Dept. Stores, Inc. v. Beckwith*, 989 P.2d 882, 884–85 (Nev. 1999).

[98] ECF No. 129 at 27.

[99] ECF No. 129.

[100] *Ponsock*, 732 P.2d at 1366; *see also* n.1.

[101] *Ponsock*, 732 P.2d at 1366.

into a for-cause-termination one. D'Angelo was hired by the defendant as a salesman and promoted twelve years later to department manager.[102] He was later terminated for selling certain products at a discount, which his employer claimed was a "violation of work rule number 6" in the employee handbook.[103] There was also evidence that, "[a]t the time of his hiring, and as a condition of his being hired, D'Angelo was required to read and acknowledge his understanding of the employee handbook."[104] The handbook had disciplinary provisions enumerating grounds for termination, informing the employee that he could be terminated only for "proper cause" and that termination for failing to perform work competently must be "preceded by written notice to the employee." The Nevada Supreme Court concluded that a reasonable jury *could* find that D'Angelo had an implied contract for employment that could be terminated only for cause, and it reversed the district court's grant of summary judgment and remanded the case for a trial on the merits. Importantly, *D'Angelo* did not establish a blanket rule that an employee handbook with disciplinary terms automatically converts an otherwise at-will employment into for-cause employment. It stands only for the proposition that additional employment-related documents can rebut the presumption of at-will employment.

But, unlike D'Angelo, Finn has not rebutted the presumption that his employment was at will. Finn does not cite, quote, or reference any provision in the Manual. Instead, by attaching it "in its complete form," he implicitly invites me to peruse it for supporting language.[105] The district court is "not required to comb through the record to find some reason to deny a motion for summary judgment."[106] It is the job of the "party opposing summary judgment [to] direct [the

---

[102] *D'Angelo*, 819 P.2d at 209–10.

[103] *Id.* at 209.

[104] *Id.*

[105] ECF No. 129 at 27 (citing Exhibit 35).

[106] *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)).

Court's] attention to specific triable facts."[107]

Not only has Finn not pointed me to a provision in the Manual that alters his at-will employment relationship, but this would be a high hurdle to clear in light of this record. The offer letter that Finn received from the City makes it crystal clear that his position is at-will, and only a written agreement signed by the City Manager can alter it:

> This position is an at-will position. Nothing is intended to create or imply a contractual relationship; if hired, the employee understands that employment is at will, i.e., that it is not for any specific time period or duration and can be terminated with or without reason at any time. While employment policies or procedures may change from time to time, only a written agreement signed by the City Manager can change the employee's at-will status.[108]

It is undisputed that Finn agreed to those terms and accepted the position. And he does not argue—let alone demonstrate—that the Manual is a written agreement with the City Manager that altered his employment status. The Manual thus does not rebut the presumption and record evidence that Finn's employment was at will.[109]

This record leads me to but one factual conclusion: Finn was an at-will employee. His breach-of-implied-contract claim thus fails as a matter of law.[110] So I grant summary judgment for the defendants on this claim.

---

[107] *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

[108] ECF No. 109-1 at 3.

[109] Finn also argues that his employment lost its at-will status because he was required to live in Boulder City, wear a uniform, maintain his Peace Officer Standards and Training (POST) certification, attend City Council meetings, be on call 24/7, and not leave Clark County unless his second-in-command was in the county and within 30 minutes' response time. ECF No. 129 at 24. But Finn offers no authoritative support for the proposition that these obligations somehow converted his at-will status into something else, and I find none.

[110] *See Bally's Grand Employees' Fed. Credit Union v. Wallen Eyeglasses*, 779 P.2d 956, 957 (Nev. 1989) (contract claims fail without "an express or implied contract that [employee] would be terminated only for just cause.").

**F.       Sixth claim for relief: FMLA violation**

Finn's sixth claim for relief alleges that the City violated the FMLA by terminating him as soon as he returned from approved FMLA medical leave.[111]  Finn moves for summary judgment in his favor on this claim, arguing that the FMLA guaranteed him employment—either as Chief or in another capacity with comparable pay and benefits—and that the timing of his termination shows that his medical leave factored into it.[112]  The defendants cross move for summary judgment, arguing that Finn cannot show a causal connection between his leave and his firing.[113]

The FMLA "guarantees that an employee's taking leave will not result in a loss of job security or in other adverse employment actions."[114]  "To prevail on a claim that FMLA leave was impermissibly considered in the decision to terminate, the employee must prove by a preponderance of the evidence that taking FMLA leave was a negative factor in the decision to terminate [him], by using direct or circumstantial evidence, or both."[115]  The *McDonnell-Douglas* "scheme shifting the burden of production back and forth is [not] required."[116]

Finn offers no direct evidence that anyone at the City considered his FMLA leave when making the decision to fire him.  His evidence that FMLA leave was a negative factor in his termination is entirely circumstantial.  It boils down to this stylistically emphasized fact and inference: "Since Finn was fired **WITHIN MINUTES ON THE DAY HE RETURNED**

---

[111] ECF No. 26 at 21.

[112] ECF No. 106 at

[113] ECF No. 109 at 16–17.

[114] *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003).

[115] *Lew v. Superior Court of Cal.*, 348 Fed. Appx. 227, 229 (9th Cir. 2009) (citing *Liu*, 347 F.3d at 1136 and *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001)).

[116] *Bachelder*, 259 F.3d at 1125.

**FROM FMLA LEAVE**," the decision to fire him had to occur while he was on FMLA leave.[117]

But Finn does not affirmatively contend that he was fired *because* he took FMLA leave. To the contrary, in his opposition to the defendants' motion for summary judgment, he claims that he was fired "in retaliation for his filing suit against a member of the city council and the city attorney. They [just] waited to terminate Finn after Ms. Mayes left and upon Finn's immediate return from FMLA leave."[118] So, although Finn repeatedly points out that his termination *temporally coincided with* his return from leave, he does not actually contend or show that it was *causally linked* in any way to the leave, as a negative factor or otherwise.

Finn thus has failed to demonstrate that he is entitled to summary judgment on this claim as a matter of right, and he has not shown a genuine issue of fact to support it and prevent me from entering summary judgment in favor of the defendants. Accordingly, I deny Finn's motion on this claim[119] and grant the defendants'.[120]

**G.      Seventh claim for relief: violation of the Peace Officers' Bill of Rights**

As his final claim, Finn alleges that Boulder City violated multiple provisions of Chapter 289 of the Nevada Revised Statutes, also known as the "Peace Officers' Bill of Rights." Finn theorizes that the City violated this statutory scheme when it investigated him for looking up a license plate allegedly without authority, and for allegedly using an off-duty detective to benefit his state-court lawsuit.[121] He claims that the statute entitled him to a copy of the City's investigative file on these secret investigations, and "[i]f FINN was fired for any act or omission that would have triggered his NRS Chapter 289 rights," or "[i]f anything was written up about"

---

[117] ECF No. 106 at 7 (emphasis original).

[118] ECF No. 129 at 29.

[119] ECF No. 106.

[120] ECF No. 109.

[121] ECF No. 26 at 22.

him, he had the right to know that information, . . . ."[122]  Finn moves for summary judgment on this claim in his favor,[123] and the defendants countermove in theirs.[124]

Defendants primarily argue that Finn's claim fails because the Peace Officers' Bill of Rights applies only to investigations of a peace officer by a law-enforcement agency, and the City of Boulder City—which was the entity that was investigating Finn—is not a law-enforcement agency to which the statutory scheme applies.[125]  But whether the City qualifies as a law-enforcement agency is not settled by this record.

Chapter 289 grants peace officers certain rights when they are being investigated by their law-enforcement agency.  For purposes of this chapter, "agency" "means an agency of the State or of a local government which employs one or more persons as peace officers."[126]  The City itself may qualify as a law-enforcement agency in this case because it employs at least one person as a peace officer: Finn.  Finn's hiring letter, which is attached to the defendants' motion for summary judgment, was not penned by the Boulder City Police Department; it was sent by the City itself and signed by the City Manager.[127]  It opens, "Congratulations on your appointment to the Police Chief position with the City of Boulder City."[128]  A reasonable jury could conclude from this letter that the City—as Finn's hiring entity—qualifies as a law-enforcement agency for purposes of Chapter 289.  So, the question of whether Chapter 289 applies to the City does not

[122] ECF No. 26 at 22–23.

[123] ECF No. 110.

[124] ECF No. 109 at 13–15.

[125] Clearly, none of the individual defendants qualifies as a law-enforcement agency, so this claim cannot be maintained against any of them.  It appears, however, that this claim is only directed at the City, as it concludes, "FINN's statutory rights as a Nevada Peace Officer were completely dismissed **by the city**."  ECF No. 26 at 23, ¶ 130 (emphasis added).

[126] NEV. ADMIN. CODE § 289.015.

[127] ECF No. 109-1.

[128] *Id*. at 2.

preclude summary judgment in favor of the plaintiff.

But this claim fails in other key ways that compel summary judgment for the defendants. Finn pleads this claim based on NRS 289.080(6), which he alleges "states that the Peace Officer is entitled to a copy of their administrative and investigative file, including notes, transcripts and other documents, related to the investigation."[129] NRS 289.080(**6**) actually says "Any information that a representative obtains from the peace officer who is the subject of the investigation is confidential and must not be disclosed except upon the: (a) Request of the peace officer; or (b) Lawful order of a court of competent jurisdiction."[130] It's subsection **8** of that statute that requires an investigative body to turn over a copy of the file, "including, without limitation, any recordings, notes, transcripts of interviews and documents contained in the file," but that disclosure obligation only ripens "After the conclusion of the investigation" and only "if the peace officer appeals a recommendation to impose punitive action."[131] Even if I assume that the audit was an investigation into Finn by the City, a law-enforcement agency,[132] Finn has not pointed to evidence in the record suggesting that he appealed a recommendation to impose punitive action. Thus, the record does not support the notion that NRS 289.080 was triggered for Finn, let alone violated by the City.

In his motion for summary judgment on this claim, Finn also references[133] NRS

---

[129] ECF No. 26 at 22, ¶ 128.

[130] NEV. REV. STAT. § 289.080(6).

[131] NEV. REV. STAT. § 289.080(8) reads, "After the conclusion of the investigation, the peace officer who was the subject of the investigation or any representative of the peace officer may, if the peace officer appeals a recommendation to impose punitive action, review and copy the entire file concerning the internal investigation, including, without limitation, any recordings, notes, transcripts of interviews and documents contained in the file."

[132] Even if the investigation by the Attorney General into Finn's conduct was a law-enforcement investigation, the City could not be liable for any AG violation of NRS Chapter 289. So, only the audit could qualify as a City investigation for purposes of this lawsuit.

[133] In his 35-line argument section in support of his motion for summary judgment on this claim, Finn fails to cite to or analyze a single specific provision of Chapter 289. *See* ECF No. 110 at

289.060(3)(d), arguing that he "should have been notified of the investigation, a record of it should have been placed in his personnel file, and [he] should have been allowed to respond to the allegations against him."[134] But Finn grossly over-misrepresents what the statute requires. NRS 289.060(3)(d) requires the law-enforcement agency to "[a]llow the peace officer who is the subject of the investigation or who is a witness in the investigation to explain an answer or refute a negative implication which results from questioning during an interview, interrogation or hearing."[135] And Finn has not cited any evidence to suggest that there was "questioning during an interview, interrogation[,] or hearing," let alone that which produced "a negative implication." So Finn has not shown that any provision of the Peace Officer's Bill of Rights was triggered, let alone violated by the City here. The defendants are thus entitled to summary judgment on this claim, too.

## Conclusion

Accordingly, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Finn's motions for partial summary judgment on his FMLA-violation claim **[ECF No. 106]** and Peace Officers' Bill of Rights claim **[ECF No. 110] are DENIED;**

---

8–9. The same is true of his response to the defendants' motion, *see* ECF No. 129 at 30–31, and his reply in support of his motion for summary judgment on this claim. *See* ECF No. 132. He offers two full, single-spaced, tiny-font pages of block-quoted provisions from the Chapter (NRS 289.202, 057, and 060) introduced by the unhelpful transition, "NRS Chapter 289 provides in pertinent part: . . . " ECF No. 110 at 4. But Finn makes no attempt to tie any alleged conduct to any specific statutory provision. It is not the court's job to do that work for Finn and his counsel.

[134] ECF No. 110 at 6–7.

[135] NEV. REV. STAT. § 289.060(3)(d).

IT IS FURTHER ORDERED that defendants' motion for summary judgment **[ECF No. 109] is GRANTED. The Clerk of Court is directed to ENTER JUDGMENT in favor of the defendants and against the plaintiff on all claims and CLOSE THIS CASE.**

DATED: January 17, 2018.

_____
U.S. District Judge Jennifer A. Dorsey